Bobby BATTLE et al., a class action, Plaintiffs,

United States of America, Plaintiff-Intervenor,

v.

Park ANDERSON, his successor Richard Crisp, Warden, Oklahoma State Penitentiary, McAlester, Oklahoma, and his successor, J. M. Sunderland, Warden, Oklahoma State Reformatory, Granite, Oklahoma, and his successor, Department of Corrections, F. Warren Benton, Director, his successor, and the current State Board of Corrections, Frank E. Carey, Jr., President, Leroy W. Kirk, Patricia Montgomery, Gary M. Cook, Chester T. Curtin, Seth Millington, William Thompson, as members, and their successors, Defendants.

Civ. A. No. 72–95.

United States District Court, E. D. Oklahoma.

June 14, 1977.

Louis Bullock, Stillwater, Okl., Mary E. Bane, Oklahoma City, Okl., and Gary Neal, Tulsa, Okl., for plaintiffs.

Drew S. Days, III, Gen. Counsel, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C. and Charles Ory, and Paul Lawrence, Attys., Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor.

Paul Crowe, John Fischer, Harold McMillan and Amalija Hodgins, Asst. Attys. Gen., Oklahoma City, Okl., for the State of Oklahoma, for defendants.

## MEMORANDUM OPINION

BOHANON, District Judge.

Plaintiff's Motion for Emergency Supplemental Relief as to Crowding came on for hearing after due notice May 23, 1977, plaintiff appearing by its attorneys Louis Bullock, Stillwater, Oklahoma, and Gary Neal, Tulsa, Oklahoma; the United States of America appearing by Drew S. Days, III, Charles Ory and Paul Lawrence, United States Department of Justice, Washington, D.C.; defendants appearing by Paul Crowe, John Fischer, Harold McMillan and Amalija Hodgins, Assistants Attorney General, Oklahoma City, Oklahoma.

The conditions which precipitated and caused the disastrous riot of 1973 at McAlester now prevail throughout the system. In the hearings conducted by the court in 1974 prior to its May 30, 1974 Order (376 F.Supp. 402) the court heard the shocking details of the conditions existing prior to the riot and became convinced that the neglect, apathy and deliberate disregard for human decency and rights contributed directly to the tragic loss of lives and $20 million in state property damages. It is now equally convinced that the inmate conditions now existing present an immediate and intolerable threat to the safety and security of inmates, prison personnel and the people of the State of Oklahoma with attendant monetary losses and costs of staggering proportions.

The Court's original order specifically dealt with the following areas: Racial Segregation and Discrimination; Due Process; Disciplinary Punishments; Health Care Delivery System; Chemical Agents; Access to the Courts and Public Officials, and Attorneys; Mail and Publications rules; Staffing and Security; Conditions of Confinement; and Religious Freedom.

Since May 30, 1974, the Defendants have made significant progress in many of the areas outlined in the original order. In other areas, such as medical care, the Defendants have not complied.[1]

Subsequent to the May 30, 1974, order, periodic hearings have been held at approximately six month intervals. The hearings involved Defendant's compliance, submission of plans required by the order; and/or the intransigence of the Defendants or of counsel for the Defendants.[2]

Evidence concerning the problem of overcrowding and the conditions of confinement had been previously presented at the May 4, 1976 and October 14–15, 1976 hearings. While the Court did not issue any orders at those times, it clearly indicated to the Defendants that the then existing population levels and conditions were intolerable and that the Court was considering the issuance

---

1. On May 30, 1974, Defendants were ordered to submit a comprehensive medical plan within 60 days. On October 15, 1976, Defendants presented a first draft outline for a medical plan. On May 24, 1977, the Court ordered Defendants to present a medical plan within 60 days.

2. In the October, 1974, hearing the Court found that Defendants were not in compliance and were interfering with Plaintiff and Plaintiff-Intervenor's access rights to the Department. In April, 1975, Defendants were again found not in compliance. In June, 1975, the Court had to intervene to stop Defendants' counsel from costing the Department of Corrections several million dollars of LEAA funds. In May, 1976 the Court found Defendants not in compliance. The May, 1977, hearing in part dealt with Defendants intransigencies and only minorly with compliance.

of an injunction. In the interim the problem kept growing.

On April 21, 1977, Plaintiffs moved the Court for emergency supplemental relief as to crowding. On April 27, 1977, the United States requested an evidentiary hearing on the issues of overcrowding and conditions of confinement. On April 29, 1977, Defendants responded that the conditions caused by the present level of population were in no way harmful or unconstitutional.

At the hearing three expert witnesses testified. The experts were Theodore Gordon, an environmental health specialist; Fred Moyer, an architect and Director of the National Clearinghouse of Criminal Justice Planning and Architecture and Charles Robert Sarver, a former correctional administrator for two states and presently a professor of law and sociology.

Mr. Gordon testified concerning the conditions of confinement within the Department of Corrections, of the health dangers associated with the facilities; of problems associated with the water, fire, sewage, and utility infrastructure within the system.

Mr. Moyer testified concerning the architectural and design needs associated with penal institutions and their rationale; regarding the various national standards for space needs and space management within prisons and concerning his assessment of the physical plants with regards to habitability and functional adequacy.

Mr. Sarver testified regarding the management problems associated with overcrowding, and to admissions which prison officials had related to him concerning their overcrowding problems.

The Government called Director Dr. E. Warren Benton and Warden Richard Crisp who showed that they are conscientious public servants dedicated to the improvement of the Oklahoma Department of Corrections; a fact attested to by each of the substantive witnesses testifying on behalf of the plaintiff and plaintiff-intervenor. The State put on no substantive case.

The Court was aided in making its decision by the three expert witnesses previously mentioned, the State Senator who chaired the appropriations subcommittee which passed on the Defendant's budget, documentation from the Department of Corrections and Oklahoma State Legislature, and an actual true scale model of a typical McAlester prison cell.

As a final preliminary statement, Federal Courts are reluctant to intervene in the operations of penal facilities. Deference is given to prison officials; in time however, continual deference becomes negligence. This court has found on five separate occasions since May 30, 1974, that the Defendants were not in compliance with its order or that the Defendants were obstructing the orderly resolution of this case. Each time the court listened to the evidence that proved a constitutional deprivation and to Defendants averment of future improvement. The Court deferred in hope that the promises could remedy the situations. And with the leadership assumption of Warden Crisp in Fall 1974 and Director Benton in September 1975 for a time it appeared that those hopes might be realized.

Good intentions are not enough. In October 1976, the Court learned that the Board of Corrections in its FY 78 Budget called the conditions within the Department a shame and disgrace to the State of Oklahoma. The evidence put on by plaintiff and plaintiff-intervenor shows the problems facing the Department of Corrections vitally affects the physical and mental health and safety of each inmate. The Court is compelled to issue the following opinion and order.

### Findings of Fact

I. *General*

1. The Oklahoma Department of Corrections is an executive agency of the State of

Oklahoma. It is headed by a Director. The Director is appointed by the Board of Corrections. The Board of Corrections is appointed by the Governor. The rights, responsibilities and duties of each are clearly set out by Oklahoma State Statutes (57 O.S.A. 503, 504, 506, 507, 510).

2. The Oklahoma State Constitution at *Art. I, § 1* states that the Federal Constitution is the supreme law in Oklahoma which must, if need be, take supremacy over State Law.

3. The Department of Corrections has legal custody over each individual committed to prison by the State Court system in Oklahoma. The Department of Corrections also administers the probation and parole supervision tasks for the State of Oklahoma.

4. The instant case is a class action. The class is all persons presently under the control or jurisdiction of the Department of Corrections. All possible damage or monetary claims of any possible member of the class were severed from this action on March 15, 1974. Therefore, this class action is only concerned with declaratory and injunctive relief.

5. As of May 23, 1977, the Department of Corrections housed inmates in the following facilities: The Oklahoma State Penitentiary—inside (OSP or McAlester); the Oklahoma State Penitentiary—Male Trusty Buildings (Trusty Building); the Oklahoma State Penitentiary Women's Ward (Women's Ward); the Oklahoma State Reformatory (Granite or OSR); Lexington Regional Training Center (Lexington or Wooden Buildings); the Ouachita Training Center (Ouachita or Hodgens); the McLeod Honor Farm (McLeod or MHF), the Vocational Training Center (Stringtown or VTC); the Women's Treatment Facility in Oklahoma City (WTF); the Oklahoma City, Thunderbird CTC; the John 3:16, Tulsa CTC; the H. Mann, Tulsa CTC; the Lawton, CTC; the Enid, CTC; and the Muskogee, CTC. In the near future the Department is also

planning to house inmates at the Oklahoma City—Suntide CTC; the new Lexington A & R center; the new Lexington II medium security facility; the new Hominy Medium Security Facility; and the newly to be acquired Sulphur facility.

6. The present leadership of the Oklahoma Department of Corrections as exemplified by such individuals as Dr. F. Warren Benton and Richard Crisp are extremely professional persons trying to do an almost impossible job.

7. There have been many improvements in the conditions and procedures which gave rise to the filing of this case and the court's May 30, 1974, order (376 F.Supp. 402). Also there are many conditions which have not changed. A large percent of the inmates are still not either in useful employment or programs. An inordinate number of inmates are in segregative classifications (e. g. protective custody, disciplinary segregation, administrative segregation, or a lesser form of disciplinary segregation and/or administrative segregation which did not exist at the time of the original litigation which is called maximum security custody). The employee turnover rate at prisons like McAlester is still excessive. Further, the numbers of employees at the various prisons is still woefully inadequate. This leads to the extensive and the excessive use of segregation status mentioned above.

8. The lack of jobs and programs together with the present excessive use of the segregation has caused a situation where this court can only find that the Oklahoma Department of Corrections does little more than warehouse very large number of inmates.

II. *Population Problems*

9. Government's Exhibit 8, a letter dated March 22, 1977 to the Honorable John Young, State Senator, from F. Warren Benton, Director, Oklahoma Department of Corrections, states:

"Finally, you requested information about the overcrowding which results from the situation described in the tables

above. The following table lists the design capacity, critical capacity and current population of each of our institutions and community treatment centers.

TABLE 11

| CORRECTIONAL FACILITY | DESIGN CAPACITY | CRITICAL CAPACITY | CURRENT POPULATION | PERCENT OF DESIGNED CAPACITY | PERCENT OF CRITICAL |
|---|---|---|---|---|---|
| Oklahoma State Penitentiary | 874 | 1,977 | 1,949 | 223% | 99% |
| Oklahoma State Reformatory | 219 | 682 | 629 | 287% | 92% |
| Lexington | 296 | 449 | 464 | 157% | 103% |
| Ouachita | 163 | 246 | 205 | 126% | 83% |
| McLeod | 156 | 258 | 266 | 171% | 103% |
| Stringtown | 246 | 391 | 388 | 158% | 99% |
| CTCs | 317 | 490 | 324 | 102% | 66% |
| Women's Treatment Facility | 29 | 77 | 74 | 255% | 96% |

10. On May 24, 1976, the Director of Corrections testified that the inmate population was approximately 4600.

11. Each resident living in a cell should have a minimum of 60 sq. feet of sleeping space and each resident of a dormitory, 75 square feet. Square footage in a cell is defined as the interior measurements of the cell divided by the number of inmates living in the cell. Square footage of a dormitory is defined as the interior measurements of the dorm minus any area devoted to bath facilities, program space, recreation space, office space and minus a four foot wide fire corridor reaching from each bunk to the nearest exit. This is the Department of Corrections' definition and was found to be the absolute minimum, humanely permissible by the expert witnesses at the hearing.

12. A cell or dorm space is an inmate's home for at least twelve to sixteen hours a day. Further testimony revealed that large numbers of inmates are restricted to their cells for periods in excess of 150 out of the 168 hours a week. The minimum requirements for a cell are a bed, a writing surface, a toilet, a wash bowl with hot and cold running water, and a clear space area sufficient to allow the individual room to turn around in and stretch out in. The cell needs adequate ventilation and lighting.[3]

Also necessary for the inmates' "house" is a storage area for personal effects and important papers.

13. On March 7, 1977, the Department of Corrections held 4440 inmates. One thousand and twenty (1020) inmates were housed in areas of less than 20 square feet. One thousand and ninety-eight (1098) inmates were housed in areas of from 20 to 39 square feet. At the time of the May 23, 1977, hearing, the prison system housed approximately 200 more inmates than in March.

14. On March 7, 1977, the Department's Division of Institutions[4] housed approximately 3975 inmates. One thousand four hundred and twenty-seven (1,427) inmates were not in any job or programatic (educational, vocational rehabilitation, etc.) assignments.

15. The degree of idleness is most serious at McAlester, where on April 28, 1977, only 581 of 1506 inmates were assigned to jobs or programs.

16. According to the Department, Oklahoma has not constructed a new correctional facility which is operational since the immediate days after statehood. Since then it has adapted or inherited a variety of buildings to serve as correctional facilities.

3. Adequate ventilation is defined as 60 cubic feet per man per minute, adequate lighting as 30 foot candles, see American Public Health Association's Standards for Health Services in Correctional Institutions.

4. The Division of Institutions consists of all inmates assigned to the Department of Corrections who are not placed in the various Community Treatment Centers.

Many of these structures are not designed for correctional purposes and are not suitable for penological needs. *The Oklahoma Department of Corrections-Contingency Plan* states:

"As a result of our neglect since the turn of the century, we now have a prison system which not only cannot house the number of people committed to it, but also does not contain as many secure spaces within it as the number of people requiring such incarceration.

"Our prison system can be considered to be similar to a pipe which received water on one end and releases it on the other end. If more water is forced into the front end than is released from the back end, the pipe will burst.[5]

"This (overcrowding) is not a desirable condition since it reduces the security within our institutions. It was under such condition that the disturbance (July 27, 1973, riot) at McAlester occurred; and it was under conditions of 25% overcrowding that the recent incident at Granite Reformatory took place. (Hostages were taken in October, 1975, when Granite had a population of 600.)"

Likewise there was an incident at Granite on April 12–13, 1977, in which drunk inmates in the East cellhouse dorm almost started dangerous fires and that chemical agents had to be employed to break in. By grace of good luck nothing worse happened during the incident than some smoke damage and a few people being hit with light bulbs.

17. Overcrowding causes many problems in the correctional context. Many of the problems are self evident or intuitive in nature. One of the best propoundments of the problem which the Court has read has been authored by the Oklahoma Department of Corrections. Therefore, the Court now quotes from the Department. Problems associated with overcrowding:

*Fiscal*

Increased population levels will put increased strain on Fiscal Year 76's budget for each institution, especially in the area of food purchases.

This fear was re-realized in the Fiscal Year 78 budget when the Department, because of the population increase, found its per capita food budget actually significantly decreased.

*Security*

All institutions will suffer in the *degree of security* which they can provide as their population increases. As "maximum-security" facilities are forced to house more than one inmate per cell, incidents of fighting, assault, extortion and homosexual behavior can be expected to increase. Lesser security-status institutions, especially those without fences or bars, can anticipate increased escape, especially if high standard of classification criteria must give way to a more basic need merely to house an expanding number of bodies.

Also, as the upper-most limit on each defined capacity level is reached, the *loss of flexibility* in shifting inmates between institutions, cellhouses, and dormitories or merely between rooms is likely to have an effect on the tension level in an institution and the degree of security which can be provided.

In the security context, one of two things can happen with overcrowding. Either the concept of security can break down or the residents can face increasing lock down and repression. Both aspects are occurring within the Department. At McAlester one-third of the inmates are working at any given time. The rest are basically either locked down or sent to the "special yards" to fritter away the time. Overcrowding increases tension and fear among the inmates. An indication of this can be gained from an examination of the numbers of

5. Dr. Benton wrote these words on October 31, 1975. Little did he realize that the words were literally true. Infra is mentioned the severe water problems which certain DOC facilities have. In fact, on May 13, 1977, the inadequate water pipe at Stringtown burst and the unit was without water when the experts for the United States toured the facility.

inmates who have requested to be placed on protection (inmates on protection are locked in their cells all but about five to eight hours a week). On June 30, 1975, when McAlester had a population of 972 inmates, 44 or 4.5% of the population requested protection. On May 12, 1977, when the population was 1522, 140 inmates, or 9.2% of the total, requested protection.

### Programs and Equipment

All inmate programs and activities will be strained by increasing population levels. The quality and number of services provided inmates (such as access to law libraries, canteens, recreational equipment, etc.) will diminish. Work assignments will have to be developed, possibly beyond limits of required maintenance.

The contingency plan then went on to state that bunk bed arrangements should never be used. However, at the time of the hearing, the reception center for inmates consisted of an open double bunked dorm.

18. The reception station contains young first termers and old jail wise repeaters. No separation was made in this open and crowded arrangement unless someone from the prison staff happened to know the background of a particular new arrival.

19. The basic housing arrangement in McAlester is the celling of two men in 8' x 5' cells or four men in 6' x 16' cells. The basic arrangement at Granite is the housing of two men in 5' x 7' cells or four men in 5' x 11' cells. At the other prisons the housing is generally open dorms. The degree of crowding varies with the facility from only 55% of capacity at the 100 person H. Mann CTC in Tulsa to 255% of capacity at the Women's Treatment facility. The exact figures are set out in paragraph 9, *supra*.

20. The Oklahoma prison system at the time of the hearing contained about 4600 inmates in a system designed for 2400. When the Alabama system was found to be overcrowded, *McCray v. Sullivan*, 509 F.2d 1332 (5th Cir. 1975) the system contained 3698 inmates in facilities designed for 2212 inmates. The degree of overcrowding in Oklahoma was 191%, in Alabama 140%.

### III. Conditions of Confinement

21. The conditions of confinement within a correctional context are an amalgam of the physical and environmental conditions. Important factors are the architectural state and design of the facilities, the utilities infrastructure, the sanitation, the potential for diseases and the potential for fire and its containment. There are serious problems with the Department's facilities. The problems will be enumerated by prison.

22. *The McAlester Complex.* The cellhouses at McAlester do not have a ventilation system. There is literally no moving air within the structures. As a result experts for the Plaintiff-Intervenor reported to the Court a seven degree temperature rise from the bottom to top floor in one of the cellblocks. In the West cellhouse the run has even begun separating from the wall on the upper tiers.

The plumbing and water system is inadequate for the task and contains multiple leaks. As such, according to documents prepared by the Department of Corrections, it violates The Federal Water Pollution Control Act, as amended in 1972, the Federal Safe Drinking Water Act of 1974, and the Oklahoma Department of Health regulations. The population pressures have further overtaxed the sewage system so that McAlester further violates the Environmental Protection Act and helps to contaminate the water of surrounding communities.

Further an architect commissioned by the Department has stated that the present kitchen and dining facility is structurally unsound and impossible to keep free of rodent and vermin infestation or sewage overflow in its basement.

The complex has inadequate showers for its population. In the dormitory components there are also inadequate numbers of towels and wash bowls. Hot water is not provided in the cellhouse cells.

23. *Granite.* The East and West Cellhouses at Granite have similar problems as those in McAlester. Likewise the same problems exist with regards to showers, toilets and face bowls.

The state of utilities at Granite is critical and approaching the point of being an imminent danger. The water supply is inadequate and unprotected. There is a water storage problem both for water for drinking and hygiene and also for fire purposes. The sewage system is too small for the population and thus passes untreated sewage into the environment. There are no mechanical monitoring devices on this system. The natural gas system leaks throughout the complex. The fire fighting capabilities are nonexistent, with the water lines too small to supply the amount of water that would be needed, the lack of fire hydrants and the lack of adequate storage. The water system violates each of the acts cited in connection with McAlester as well as the National Fire Underwriters *"Life Safety Code".*

The kitchen and mess facilities are severely overtaxed and constitute an imminent health danger. Experts for the Plaintiff-Intervenor testified that the entire facility should be phased out over a ten to fifteen year period. The Oklahoma Corrections Master Plan authorized by Dr. Benton makes the same recommendation.

24. *Lexington.* Lexington is an imminent health and safety hazard. The Defendants' contingency plan states that the existing wood facilities "were designed and constructed during World War II for a maximum use expectancy of less than ten years. The design, the materials and the method of construction anticipated that the buildings would be demolished within ten years. The plumbing, the electrical system, the foundation and all other aspects of these facilities have been used far beyond their intended use life."

The wooden buildings constitute a serious fire hazard.

The food facilities are infested with mice and rats. The food system is woefully overtaxed and is an imminent health danger. There are inadequate shower and toilet facilities for the residents.

25. *Ouachita.* Ouachita has the similar utilities problems as in the other facilities. There is unsafe storage for water, too small of water lines to supply either the drinking or fire needs of the institution, inadequate sewage facilities and inadequate water storage and fire hydrants for fire protection. It violates the same laws and standards as were mentioned above.

26. *McLeod.* McLeod has the worst problem with water, sewage and fire protection in the system. There is inadequate hot water for the kitchen, the supply is not chlorinated or sealed to prevent contamination. There is no standby water source or storage. The sewage system is extremely overloaded for the population and there are no measurements taken. Fire protection is further hampered in that the existing lines are too small to provide sufficient water. Further there are no fire hydrants. The utilities infrastructure at McLeod violates each of the five standards/acts mentioned above.

McLeod is set up as an open star shaped building with the kitchen and dining areas housed in the center finger. There are inadequate facilities/utilities for personal hygiene and the kitchen operation is severely overtaxed.

27. *Stringtown.* Stringtown presents the second most serious water problem in the system. The facility needs a water treatment plant to produce safe drinking water in accordance with the Federal Safe Drinking Water Act of 1974. Further, there are no facilities for water storage. The seriousness of the water problem was highlighted by the fact that the prison was without water on the date it was inspected by experts for the Plaintiff-Intervenor.

The sewage and natural gas systems are inadequate for the present populations.

The facility is composed of three dormitories. One of these, the North Building, is without any water supply, toilets, or washing facilities.

28. Each of the environmental health and safety problems mentioned above are exacerbated by the overcrowding. As Defendants stated in their contingency plan: "as the population is increased at any particular institution, plumbing facilities,

kitchen facilities, medical capabilities and the like may be overtaxed to such a point that health standards and the general quality of life begin falling below judicially acceptable standards."

In the medical context, overcrowding has been shown to increase the incident of both infectious communicable diseases (e. g. flu, hepatitis, tuberculosis, etc.) and stress-related diseases (e. g. rashes, asthma, hypertension, etc.).

## IV. *Conduct of Defendants*

29. The law contemplates a vigorous legal defense by the Defendants' counsel, not obstinance for its own sake. The Court entered its original order on May 30, 1974. Counsel for the State did not appeal. Therefore, it was to be expected that they sit down and work with counsel for the Plaintiff and Plaintiff-Intervenor to resolve problems. In October of 1974, the Court had to issue a supplemental order expressly telling counsel for the Defendants the access rights of Plaintiff and Plaintiff-Intervenor to the premises and personnel of the Defendants. In June of 1975, the Court had to intervene to allow the FBI access to the Department (a right specifically given in the May, 1974, order).

Counsel for the State, however, exceeded themselves in the period immediately prior to the May 23, 1977, hearing. Experts for the Plaintiff-Intervenor were prohibited from conversing with line employees or inmates. They were prohibited from conversing with the wardens of the various prisons.

Plaintiff and Plaintiff-Intervenor counsel were required to relate expert's questions to Defendant counsel who would pass the question to the warden, if Defendant counsel thought the question proper, then the warden was permitted to answer the question, otherwise not.

This conduct can only be considered a willful attempt to prevent the Court from knowing the truth and the Court wonders if the experts only discovered the tip of the iceberg, that the actual conditions at the various prisons are, in fact, much worse.

## CONCLUSION OF LAW

1. The Court has the authority and duty to insure that the Constitution does not stop at the prison gate, but rather inures to the benefit of all, even to those citizens behind prison walls, *Jackson v. Godwin*, 400 F.2d 529, 532 (5th Cir. 1968), *Finney v. Arkansas Board of Correction*, 505 F.2d 194 (8th Cir. 1974).

2. In implementing the Constitution, courts have required that certain penal facilities be closed, *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974) *aff'd* 507 F.2d 333 (2nd Cir. 1974), *Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975), and *Hamilton v. Landrieu*, 351 F.Supp. 549 (E.D.La.1972); that inmates be housed in single cells, instead of multiple inmates in a cell, *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973) *aff'd*, 494 F.2d 1196 (1st Cir. 1974), *Detainees of Brooklyn House of Det. for Men v. Malcolm*, 520 F.2d 392 (2nd Cir. 1975) that prison population be limited to a fixed number, e. g., *Alberti v. Sheriff of Harris County, Texas*, 406 F.Supp. 649 (S.D.Tex.1975); or that inmates be afforded a fixed minimum amount square footage (see cases cited at conclusion of law 6).

3. Courts have also evaluated quality of life in penal facilities and demanded a healthy environment with adequate sanitation, ventilation, lighting and utilities, *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); regarding ventilation *Rhem v. Malcolm, supra, Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971) and *Alberti v. Sheriff of Harris County, Texas, supra.* Vermin infestations *Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975) and *Hamilton v. Landrieu, supra. See also Rozecki v. Gaughan*, 459 F.2d 6 (1st Cir. 1972) and *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972) *aff'd. sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

4. Courts have grappled with the problems and the conditions of confinement in three ways. Conditions have been found to be *per se* unconstitutional, e. g., *Rhem, supra,* conditions as exacerbated by overpopu-

lation have been found to be unconstitutional, e. g., *Williams v. Edwards, supra, Finney v. Arkansas Board of Correction, supra,* and *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976). Overcrowding *per se* has been found to be unconstitutional, *Gates v. Collier, supra, McCray v. Sullivan, supra,* and *Finney v. Arkansas Board of Correction, supra.* This Court finds that all three of these cases are existent within the Oklahoma Department of Corrections.

■ 5. In the original Order the Court ordered the closing of certain cells at McAlester. Likewise, the wooden facility at Lexington with its severe environmental and fire hazards shocks the Court's conscience and must be closed upon completion of the new Lexington A & R unit.

■ 6. The crowding in Oklahoma has reached such proportions that this Court could easily find, as other courts have, that the crowding is *per se* unconstitutional. Certainly where prisoners are forced to sleep in garages, barber shops, libraries and stairwells; and where they are placed in dormitories without any toilet and shower facilities the crowding has passed the constitutional threshold. The Court is equally or more offended by the housing of two men within a little 35–40 square foot "cubbyhole". Such crowding offends the contemporary standards of human decency, *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958).

■ The effects of the crowding as it relates to the conditions of confinement with regard to the health, safety, and security of the inmates is unconstitutional. The crowding has caused the kitchen, water and sewer systems to be overtaxed. The dining facilities, if they were outside the prison walls would be closed down as immediate health dangers. Individuals are housed in substandard living quarters which are firetraps. However, there is no plan or possibility of putting out the fire if a major one occurred.

There is a direct correlation between overcrowding and violence, see finding of fact 16, *supra.* Defendants acknowledge that the 1973 McAlester riot was caused by the then existing overcrowded conditions at the O.S.P. This court would be remiss in its duties if it did not move to act on the problems, but rather sat idly by until the increasing crowding caused another major incident to sweep the Oklahoma Prison system.

■ 7. The Court adopts the standards of the American Public Health Association for living space and environmental matters. APHA calls for 60 square feet in a cell and 75 square feet in a dormitory. In adopting the APHA 60'/75' standards respectively, the Court is mindful that most other organizations and many of the courts who have faced this problem have adopted higher standards.[6]

■ 8. In adopting the APHA environmental standards, the Court points out that a prison facility is a closed ecosystem. Persons are sent to prison as punishment, not *for* punishment. It is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment. Anything less would be to subject the individual to further punishment than was given by the sentencing trial court. With habilitation assured, then possibly or probably the inmate can decide to rehabilitate himself.

6. Organizational standards:

70 sq. feet: National Sheriff's Association at 63 (1975)

70 sq. feet: Building Officials and Code Administrators, Inc., BOCA Basic Building Code 1975 § 201.3

70 sq. feet: National Clearinghouse for Criminal Justice Planning and Architecture

75 sq. feet: The American Correctional Association Manual of Correctional Standards 49

80 sq. feet: National Advisory Commission for Criminal Justice Standards and Goals, *Corrections,* Standard 11.1, page 353

90 sq. feet: The International Conference of Building Officials *Uniform Building Code* § 1307B, p. 83

Cases:

60 sq. feet: *Pugh v. Locke, supra.*

75 sq. feet: *Ambrose v. Malcolm,* 414 F.Supp. 485 (S.D.N.Y.1976).

88 sq. feet: *Inmates of Suffolk County Jail v. Eisenstadt, supra.*

But if the basic habilitative needs of the individual are not met then rehabilitation, reformation or redemption are not possible. Water, fire protection, air and food are necessities of life. Minimum space to call one's own is a primary psychological necessity. Without the basic minimums prisons are doomed to failure, with both society and the inmates incarcerated therein the losers.

9. This Court is well aware of the financial restraints placed on the Defendants and their efforts to comply with the Constitution. But the good will shown by the Defendants cannot serve as a defense. *Finney v. Arkansas Board of Correction, supra*; *Rozecki v. Gaughan, supra*; *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark. 1970); and *Davis v. Lindsay*, 321 F.Supp. 1134, 1139 (S.D.N.Y.1970). Nor is the lack of financing a defense to a failure to provide minimum constitutional standards. *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968); *Finney v. Arkansas Board of Corrections, supra* at 199; *Alberti v. Sheriff of Harris County, Texas, supra* at 669; and *Hamilton v. Love, supra* at 1194. If the State of Oklahoma wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutionally permissible manner.

10. This Court cannot, on the other hand, allow the Defendants to violate the constitutional rights of the Plaintiffs' class and without acting to alleviate unconstitutional conditions.

Based upon the foregoing reasons of unconstitutional confinement of inmates, the Court deems it necessary to enter the following order to alleviate the unconstitutional treatment of inmates:

## ORDER AND JUDGMENT

Defendants are directed to achieve the following goals:

(a) Commencing in August, 1977, defendants shall reduce the inmate population at Oklahoma State Penitentiary, McAlester, Oklahoma, at the rate of 100 inmates that month and a like number each succeeding month until the population is reduced to 800 inmates.

(b) Commencing in August, 1977, defendants shall reduce the inmate population at the Oklahoma State Reformatory, Granite, Oklahoma, at the rate of 50 inmates that month and a like number each succeeding month until the population is reduced to 450 inmates.

(c) The Court does not require the abandonment or discontinued use of any confinement facility at this time, but within 15 months from the date hereof each inmate under the Department of Corrections who resides in a cell shall have a minimum of 60 square feet and one who resides in a dormitory shall have a minimum of 75 square feet, provided however that within the walls at the Oklahoma State Penitentiary and the Oklahoma State Reformatory the applicable requirement shall be that no more than one man will be housed per cell except in the large cells in the F cellhouse at the penitentiary where two inmates will be permitted to occupy each cell. At the end of said 15 months, moreover, no institution will be operated whose water and sewage facilities do not meet the requirements of state and federal laws.

The Court does not by this order intend for the defendant to release any inmate prematurely.

Defendants must proceed to accomplish the established goals with due diligence and good faith with all the means and resources available to them. If they do so and at any time further progress in reducing the inmate population as above provided becomes temporarily impossible or demonstrably dangerous to the welfare of law abiding citizens of the greater free society, the Court will entertain an application for temporary relief and delay in the accomplishment of the prescribed goals as shown by this evidence.

IT IS SO ORDERED.