Bobby BATTLE et al., a class action, Plaintiffs,

United States of America, Plaintiff-Intervenor,

v.

Park ANDERSON, his successor Richard Crisp, Warden, Oklahoma State Penitentiary, McAlester, Oklahoma, and his successor, J. M. Sunderland, Warden, Oklahoma State Reformatory, Granite, Oklahoma, and his successor, Department of Corrections, F. Warren Benton, Director, his successor, and the current State Board of Corrections, Frank E. Carey, Jr., President, Leroy W. Kirk, Patricia Montgomery, Gary M. Cook, Chester T. Curtin, Seth Millington, William Thompson, as members, and their successors, Defendants.

Civ. A. No. 72–95.

United States District Court, E. D. Oklahoma.

Sept. 8, 1978.

Order Sept. 11, 1978.

Louis W. Bullock, Jr., Tulsa, Okl., Carl G. Stevens and Mary E. Bane, Oklahoma City, Okl., for plaintiff.

Charles Ory and Paul S. Lawrence, Attys., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor.

Amalija J. Hodgins and Harold B. McMillan, Jr., Asst. Attys. Gen., Oklahoma City, Okl., for the State of Oklahoma, for defendants.

## MEMORANDUM OPINION

BOHANON, District Judge.

"Persons are sent to prison as punishment, not *for* punishment. It is incumbent on the incarcerating body to provide the individual with a healthy habitative environment. Anything less would be to subject the individual to further punishment than was given by the sentencing trial court. With habilitation assured, then possibly or probably the inmate can decide to rehabilitate himself.

But if the basic habilitative needs of the individual are not met then rehabilitation, reformation or redemption are not possible. Water, fire protection, air and food are necessities of life. Minimum space to call one's own is a primary psychological necessity. Without the basic minimums, prisons are doomed to failure, with both society and the inmate incarcerated therein the losers." *Battle v. Anderson*, 447 F.Supp. 516 at 525 (E.D.Okl.)

The Court on February 7, 1978, ordered plaintiffs and plaintiff-intervenors to report on the level of defendants' compliance with its prior orders in this cause, *Battle I*, 376 F.Supp. 402 (D.C.1974) and *Battle II*, 447 F.Supp. 516, *aff'd*, 564 F.2d 388 (10th Cir. 1977).

*Battle I* found constitutional violations in the following areas: racial segregation and discrimination; disciplinary procedures and punishments; health care delivery system, use of chemical agents and force; access to the courts, public officials and attorneys; mail and publication rules; staffing and security; conditions of confinement; and religious freedom.

The Court held several compliance hearings on the *Battle I* issues at approximately 6 month intervals and found that while defendants were making progress, they still were not in compliance with constitutional mandates.

*Battle II* (July, 1977) found that the conditions of confinement within the Department of Corrections did not pass constitutional muster. The Court specifically focused on the levels of crowding, physical conditions of the facilities, fire protection, ventilation, water and sewage facilities and general levels of sanitation.

The Court, in July, 1977, then ordered the defendants to reduce the population of the Oklahoma State Penitentiary at McAlester from 1,550 to 800 at the rate of 100 inmates a month and to reduce the population of the Oklahoma State Reformatory at Granite from 690 to 450 at the rate of 50 inmates a month.

The State complied with the Court's order until late December, 1977, when they moved the District Court for stay. The Court granted defendants' request for a stay, pending presentation of a compliance report from the plaintiff and plaintiff-intervenor.

In the Joint Compliance Report, the plaintiff and plaintiff-intervenor reported to the Court that defendants were in substantive compliance in the areas of religious freedom, mail and publication rules and disciplinary rules. In the areas of administrative/disciplinary due process, racial segregation and discrimination, use of chemical agents and force, access to courts, public officials and attorneys, health care delivery systems, crowding and conditions of confinement, the Report stated that the defendants were in noncompliance with the Court's orders.

Pursuant to the Court's instruction, the plaintiffs and plaintiff-intervenor conducted extensive discovery into the current operations of the Oklahoma Department. The matter came on for evidentiary hearing on August 14 and 15, 1978.

The plaintiff-intervenor and plaintiff called as witnesses representatives of the State Fire Marshal's office and the State Department of Health; the wardens of the Oklahoma State Penitentiary (McAlester) and Oklahoma State Reformatory (Granite); State Senator Al Terrill, who chaired the Oklahoma Legislature Special Committee on Criminal Justice System; Thomas Flesher, an Oklahoma City architect who is part of a joint venture architectural consortium retained by the Department of Corrections to evaluate McAlester and Granite;

Charles Robert Sarver, a former correctional administrator for two states and presently a professor of law and social work and Dr. Frank Rundle, a medical doctor and psychiatrist who is an expert in the field of health care delivery services in prisons.

The plaintiffs and plaintiff-intervenor also introduced the depositions of seven Department of Corrections employees, of the New York City architect who conducted the architectural feasibility study and of Dr. Frank Rundle.

The defendants presented five witnesses: Charles Campbell, a correctional consultant from Dallas; Dr. F. Warren Bentor, Director of Corrections; Armand Start, the Department's Medical Director; David Bickham, Executive Director of the Oklahoma Medical Association; and Dr. Donald Cooper, Medical Director of Student Health Services, Oklahoma State University, Stillwater, Oklahoma.

## FINDINGS OF FACT

### I. *Overcrowding*

1. The following chart sets out the capacities of the Department of Corrections in May, 1977 and August, 1978. It also shows the actual population at the time of the May 23, 1977 hearing, the February 7, 1978 hearing during which the stay was granted, and the population in the system as of May 1, 1978 and July 31, 1978.

| Institution | Design Capacity | | Actual Population | | | |
|---|---|---|---|---|---|---|
| | 5/77 | 8/78 | 5/23/77 | 2/7/78 | 5/1/78 | 7/31/78 |
| OSP | 874 | 874 | 1,918 | 1,597 | 1,555 | 1,523 |
| Inside | 655 | 655 | 1,551 | 1,227 | 1,209 | 1,195 |
| Farm | 159 | 159 | 248 | 269 | 255 | 254 |
| Women's | 60 | 60 | 119 | 101 | 91 | 74 |
| OSR | 321 | 321 | 684 | 482 | 499 | 498 |
| Lexington | 296 | 400 | 485 | 526 | 688 | 633 |
| Hodgens | 163 | 163 | 215 | 222 | 224 | 243 |
| McLeod | 156 | 206 | 279 | 297 | 311 | 321 |
| Stringtown | 246 | 296 | 395 | 410 | 445 | 453 |
| WTF | 29 | 29 | 73 | 66 | 29 | 36 |
| CTC | 317 | 487 | 439 | 486 | 522 | 533 |
| Totals | 2,402 | 2,868 | 4,463 | 4,132 | 4,252 | 4,250 |

2. Defendants presently are constructing and plan to have operational before the end of 1978 a new 400 bed institution at Lexington (Joe Harp), 50 more beds at McLeod and 50 more beds at Hodgens, for a capacity of about 3,400. Approximately 700 more beds are also planned for operational use during 1979.

3. In the 14 months since *Battle II*, defendants have reduced the system's population by 213 inmates, reduced McAlester by 356 inmates, Granite by 186 inmates, and added about 540 beds. Since the stay was granted, the population at McAlester has been reduced by 32 inmates and the population at Granite has risen by 16. During this interim, the reception and classification area has been shifted from McAlester to the new 400 man Lexington A & R unit.

4. As of the date of the August, 1978 hearing, over 60% of the inmates at McAlester were housed in 33 square feet or less. No inmate was housed in more than 40 square feet and many inmates were housed in 20 square feet. At McAlester, the cells in the East and West Cell Houses contain 312 cells of approximately 40 square feet. The East Cell House has 273 cells available for use. By administrative determination, the East Cell House can only have one man per cell. The inmates in the East Cell House are not eligible for work.

In the West Cell House, the first floor, north side, constitutes death row. The top (4th) floor is the protective custody area. All, but the death row area, can be and have been double celled. As of the date of the hearing, 104 of the cells were double occupied. The inmates on death row and in

protective custody are not eligible for work. The remaining inmates are unemployed since the prison does not have sufficient jobs for all the inmates.

The F Cell House has 181 cells on four floors, each cell consisting of approximately 96 square feet. Each cell houses three inmates. The inmates in the F Cell House are employed.

The inmates in both the East and West Cell House are basically idle. There is nothing for them to do other than sit in their cells or go to the yard for approximately two hours per day. The inmates in protective custody are locked in their cells at least 22 hours a day. The protection cells are double occupancy.

5. At Granite, there are two cell houses (East and West). The first three floors of the West has cells measuring 5 × 7 feet. The first three floors of the East and the fourth floor of the West have cells measuring not quite 7 × 11 (75 square feet). As of the date of the hearing, 462 inmates at Granite were in general population. Of this number, 34 inmates resided in more than 60 square feet; 164 resided in 35 square feet; 120 resided in 25 square feet; and 144 resided in 17½ square feet.

6. Both the warden at McAlester and the warden at Granite testified that their prisons should hold no more than one inmate per cell. There are 800 cells at McAlester. At Granite, there is cell and dorm space for 360 inmates.

7. The 800 and 360 figures are maximums. Both the Director of Corrections and the Department's Architectural Feasibility Study have stated that the functional capacity is 88% to 92% of actual capacity.

The reason for this is that certain space in each prison must be dedicated for special use, e. g., death row, disciplinary lockup or administrative segregation (a/k/a close custody). Further, the prisons need some vacancies to allow for emergencies and proper segregation and classification of inmates.

Therefore, the functional capacity of McAlester is approximately 720, and at Granite, it is approximately 330.

II. *Conditions of Confinement*

The conditions of confinement within a correctional context are an amalgam of the physical and the environmental conditions. Important factors are the architectural state and design of the facilities, the utilities infrastructure, the sanitation, the potential for fire and its containment. There are serious problems with the Department's facilities. *Battle II, supra* at 522.[1]

8. *The McAlester Complex.* The East and West Cell Houses at McAlester are no longer fit for human habitation. As stated in defendants' Exhibit 8 introduced during the August, 1978, hearing:

The effectiveness and efficiency of the correctional process is seriously handicapped by inadequate housing and program space. Existing facilities at Oklahoma State Penitentiary (OSP) other than the Trusty Unit and the Women's Ward, and at Oklahoma State Reformatory (OSR) are deficient to the extent that they do not meet correctional standards regarding spatial, health, and life safety issues. Most of the housing components at both OSP and OSR do not conform to standards regarding cell size and occupancy. Cells lack hot water and a natural source of light. There is no mechanical ventilation and shower facilities are inadequate. The design of the cellhouses does not conform to present guidelines for life and fire safety. The water delivery at OSP does not at this time meet State Department of Health standards. In detail, the project will address the following problem areas:

Shortage of day room space available for utilization
Lack of mechanical ventilation system
Inadequate shower facilities
Inefficient heating system

1. Other factors that relate to the conditions of confinement such as the level of crowding and

the delivery or availability of health care services will be discussed separately.

Lack of natural light in cells

Lack of hot and cold water in each cell

Inadequate power in emergency situations

Cellhouse design not in conformance with guidelines regarding life safety

Inefficient patterns of incarcerating inmates

The defendants on August 19, 1977, commissioned the firms of Gruzen & Partners, Architects & Planner, New York, New York; Noftsger, Lawrence, Lawrence, Flesher, Architects and Engineers, Oklahoma City, Oklahoma; and Fell, Brusso, Bruton and Knowles, Inc. Engineers, Architects, Planners, Tulsa, Oklahoma, to do a feasibility study of Oklahoma State Penitentiary and Reformatory.

The Feasibility Study stated that the East and West Cell Blocks at McAlester not only did not meet any current standards, but were also of dubious structural soundness due to buckling and interior rusting.[2] The study went on to state:

> "the facilities are in poor condition. The older (East and West Cell houses) housing components in both prisons (McAlester and Granite) are deteriorated, and have inadequate ventilation, plumbing and electrical systems. The fire safety component of the housing is virtually nonexistent. . . . Because of the age, condition and configuration of both facilities, it requires a great deal of diligency by the staff and a disproportionately large security staff to maintain a secure environment. The cell runs do not allow visibility of the cell doors without removing the staff from a secure area. . . ."

The study then went on to state that the present condition of the living units results in twice the utility cost per inmate as compared to a properly designed housing area. Finally, the Defendants' Feasibility Study recommended the razing of the East and West Cell Houses at both prisons and the construction of new living quarters. These new living quarters could be functionally in operation by mid 1981.

Plaintiff-intervenor's penologist also stated that the cell blocks are unfit for long term human habitation.

The F Cell House (the only remaining housing unit inside the walls at McAlester) also presently fails to meet many of the environmental and correctional standards that the other cell houses fail to meet. However, since the cell house contains outside cells of adequate size, it is physically possible to renovate it to meet standards.

The Water and Sewage systems still do not meet either State Department of Health Regulations or the Federal Water Pollution Control Act of 1972, cite *as amended*.

The State Department of Health has further reported that some of the kitchen equipment, including food servers, ice boxes and dishwashing machinery, is without adequate temperature controls or shields and that much of the equipment has not been properly maintained and is not easily sanitized. In both the food service area and the food warehouse, there are vermin, roach and rodent infestations.

The State Department of Health termed the central showering area as "crude at best". The area is remote from the living quarters and in a state of deterioration so that proper sanitizing is difficult.

Inadequacies were also found in the tag plant, brick yard, meat processing plant (where a condensation problem has led to the needed destruction of whole boxes of prepared meat), the dairy barn, and the waste disposal site.

Defendants' Feasibility Study found that at McAlester, there is presently inadequate space being devoted to visiting, library, educational and resident services programs, laundry, plant maintenance, and mechanical plant. These findings of inadequate space are assuming that only 450 inmates are being housed at McAlester. At the time of

---

2. Paul Silver, the architect in charge of the study, when questioned as to whether there was any way to assure the safety of the people who use the cell houses, replied, "The only way is to load it to failure to see where it would fail, but that is counterproductive."

the hearing, almost 1,200 inmates were housed at McAlester.

Finally, the State Fire Marshal found the McAlester complex to be in serious violation of the Life Safety Code by housing inmates without adequate methods of egress and adequate smoke detectors and hydrants. The violation occurred at all parts of the complex. In addition, the State Fire Marshal's report listed 9 pages of specific violations and concluded with the following:

An observation of this inspection team is that the penitentiary would benefit greatly if a full-time fire and safety inspector was employed. This inspection (sic) should be familiar with fire safety codes, electrical code and life and safety code; and, make regular inspections of all properties and file necessary reports to proper authorities.

9. *Granite.* For the reasons cited in Finding of Fact 8, *supra*, defendants state that all the living quarters at Granite are obsolete and should be abandoned. Granite presently only has two cell houses, East and West. The cell houses have some other problems which were not applicable to McAlester. The cells are smaller. The small cells have approximately 35 square feet. The large cells have approximately 75 square feet. The exterior wall of the cell houses are the exterior wall of the prison.

In general, defendants' Feasibility Study found the same faults with the East and West Cell Houses at Granite as were found at the East and West Cell Houses at McAlester. Specifically, they found the roofs in poor condition and in need of replacement; minor structural cracks in the floors; water leakage through the roof; through exterior walls; inadequate showers; inadequate exit facilities; no fire protection; inadequate heating system; no ventilation or cooling systems; a deteriorating plumbing system, with some showers needing complete rehabilitation; an inadequate electrical system with inadequate capacity and a distribution system needing replacement; and absence of hot water. In short, defendants' architects summed up, as they did at McAlester, by stating: "Renovation, if attempted,

should be total reconstruction leaving only the perimeter walls while gutting the existing interiors. This option must be compared with the cost-effectiveness of a partial or total facility replacement, and is not a recommended solution."

The defendants have made progress in correcting the water and sewage problems at Granite, but as of the date of the hearing, inadequate and uncleanable wells were still being used, and the sewage system was still in violation of State Department of Health regulations.

The natural gas distribution system serving the residences and the farm area needs replacing. The entire electrical distribution system at Granite requires replacement because of unsafe conditions, inadequate capacity and general deterioration.

The State Department of Health has stated that the following items are deficient and need replacing:

Steam tables in Inmate Mess Hall's serving lines

Replacement of some of the food handling equipment

The drilling of new wells and their sealing to provide a safe water supply

Repair of the showers in the cell blocks and the installation of vacuum breakers on the inmate plumbing.

The Department of Health also found health violations in the following areas at Granite:

Dairy Barn and Pasteurization Plant

Food Service and Canteen facilities

Cell blocks (see above)

The Health Department recommended that the kitchen personnel receive food handlers' training and that certain operating deficiencies be corrected.

The major fire safety recommendations for Granite are the establishment of a water storage capability and water system adequate for fighting fires. Also needed are smoke detectors, fire fighting equipment and fire hydrants. In addition to the problems of egress and water, the State Fire Marshall's office made 12 specific recommendations.

At Granite the kitchen and mess facilities, health care areas, visiting, warehousing and mechanical plants are insufficient for a projected population of 350 inmates, let alone Granite's present population of about 500.

10. *Lexington A & R.* At present, Lexington A & R consists of the new four hundred man unit and 4 wooden dormitories adjacent to the new A & R complex. In *Battle II*, the Court found that these wooden dormitories pose an "imminent health and safety hazard", and that "the wooden buildings constitute a serious fire hazard." In the fourteen months between the two hearings, the defendants have razed three wooden dormitories, but are still using 4 other wooden dormitories. The State Fire Marshal's office recommended in August of this year that the wooden dormitories be "vacated as soon as possible".

One of the wood dormitories is presently being used to house handicapped and geriatric inmates. Both classes of inmates have limited mobility. The residents, some of whom are paraplegic, and all of whom have either serious medical problems or infirmities, are housed furthest away from the medical facilities at Lexington A & R.

Defendants stated at the August hearing that the inmates in wooden housing at Lexington would be transferred to the new Joe Harp facility when it opens.

The officials of the Fire Marshal's office found other serious extant violations at the wooden portions of the Lexington complex, which serve as vocational or support facilities. Only minor technical violations were found at the new Lexington A & R. No water or sewage violations are present at Lexington.

11. *Ouachita* (Hodgens). The State Department of Health described Hodgens as follows:

The facility houses 243 people in basically five dormitories that are portable buildings. The buildings and the toilet facilities in the dormitories are dirty, in bad repair, and several do not work at all. These buildings need extensive repairs, and some need to be completely demol-

ished and replaced. There is one dining facility which is beyond practical repairs and needs to be replaced.

The State Department of Health found that there were serious problems with the solid waste, garbage, sewage and water systems.

The State Fire Marshal's office stated that there were serious fire hazards in the inmate housing quarters, and recommended establishment of additional water storage, installation of fire hydrants, fire detectors, fire equipment, and the establishment of suitable water lines for firefighting capabilities.

As of the time of the hearing, defendants were in the process of acquiring adequate water storage. The sewage system is now adequate for the present population, but not for a larger population which is projected.

12. *McLeod.* The main building at McLeod is a star shaped facility consisting of four dormitories, a food service area and a kitchen wing. The dormitories have serious fire egress problems. The kitchen facility, which is inadequate for the population, needs "to be extensively remodeled with special emphasis on wall, ceiling and floor construction, and ventilation. Some of the equipment needs to be removed and replaced with new equipment, particularly cutting tables and some utensils."

There is still inadequate hot water for the kitchen complex.

The district sanitarian has reported that upon completion of the new dormitory, the sewage system will be further burdened beyond capacity. A new dormitory is presently being constructed to house 100 inmates. The first half of the facility has already opened and houses inmates.

13. *Stringtown.* As of the date of the hearing, Stringtown still had an inadequate water and sewage system. There was inadequate water storage, a need for smoke detectors, and an additional pressure system for fire protection, and for fire equipment. The dining and food preparation

areas are too small for the population. The State Department of Health has further ". . . suggested that extensive renovation or new kitchen and dining facilities be planned."

14. *Community Treatment Centers.* In addition to the above listed prisons, the Department of Corrections operates nine community treatment centers and a small medium security women's prison in Oklahoma City (it had 34 inmates on July 31, 1978). The community treatment centers varying in size from 32 to 126 inmates. Three are located in Oklahoma City, three in Tulsa, and one each in Lawton, Enid and Muskogee. The fire code deficiencies existent in the CTC's are contained in plaintiff-intervenor's exhibit 2 (the State Fire Marshal's report of facilities). All of the CTC's have some Life Safety Code violations. The Tulsa Community Treatment Center (John 3:16) has the most severe problem.

The State Department of Health also audits the CTC's. The Health Department has reported various degrees of compliance, with some units in near compliance and others in substantial non-compliance. The results of the State Department of Health's environmental audit are contained in plaintiff-intervenor's exhibit 19.

15. The defendants have acknowledged the applicability of the following standards to their operations:

1. American Public Health Association
2. The 1976 Life Safety Code
3. The American Correctional Association's Standards for Accreditation
4. The National Sheriff's Association

The State Fire Marshal's office has adopted the 1976 Life Safety Code as applicable to the State of Oklahoma. The State Department of Health has adopted many of the sub-standards that have been recognized by the American Public Health Association (APHA) (e. g., They both utilize the same standards for food service operations). However, APHA's standards on prison environmental and health measures go further.

They specifically deal with health problems as they relate to penal facilities. In many of these areas, the State Department of Health has no standard.

To date, a recent comprehensive audit of conditions of confinement has been performed only at McAlester and Granite. The other facilities have had lessor reviews, but still were found to have significant public health and fire prevention violations.

## III. *Health Care Services*

We believe that while an inmate does not have a federal constitutional right to rehabilitation, he is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being. *Battle v. Anderson,* 564 F.2d at 403.

16. On May 30, 1974, defendants were ordered to submit a comprehensive plan covering the medical, dental and psychological needs of the inmates. To date, by their documents and by the evaluation of plaintiff-intervenor's expert, they have not yet submitted this plan. The Department of Corrections Medical Director on August 15, 1978, testified that the defendants had both a "fat" and an abridged medical plan. To date, only one medical plan has been submitted, i. e., the abridged (which was compiled and submitted before the Medical Director assumed office). Further, defendants admit that their health care services plan has already undergone severe modification, but still does not provide for the needs of all inmates.

17. The plan, as modified, has not yet been completely implemented. Steps 1, 2 and 3 [3] of the plan require further implementation through filling of staff vacancies, purchasing of equipment and construction of facilities.

18. The health care staff, both authorized and those actually on duty, as of the date of the hearing, is not sufficient.

---

**3.** Step 3 is a response to plaintiff-intervenor's objections and are contained in the FY80 Department of Corrections budget request.

There are presently more than 4,200 inmates committed to the Department of Corrections. The annual turnover in inmate population is approximately 2,400 and there are some 17 separate institutions separated by great geographic distances. The shortage in medical staff includes doctors, nurses and other support staff. The dental staff is insufficient to provide even urgently needed care, let alone preventative or maintenance care, and the Department does not have a chief dentist on the staff of the medical director.

The Health Services Plan fails to provide necessary administrative staff at the various institutions which would allow health professionals to attend to the immediate health needs of the inmates. An example of the problems presented by failure to adequately provide for administrative staff is in the area of medical records. While the Health Services Plan institutes a new system of medical record keeping which all witnesses agreed to be adequate, there remains the problem of the records of inmates who have been within the system for several years. Their records continue to be disorganized.

Another example of lack of medical staff is found in the treatment of prisoners housed in what is known as Trusty Dormitory 1 at Lexington. (This Court in its June 14, 1977 order, found these structures to be an imminent health and safety hazard.) In this dilapidated wooden frame building are housed geriatric patients; paraplegics with colostomies, and ureterostomies; and amputees and others with various chronic conditions limiting mobility. Yet, there was no nursing staff assigned to the unit. The physician never made rounds on the ward. A physician's assistant would seldom appear and the correctional medical specialist made rounds only occasionally. While this ward is to be closed upon the completion of the new Joe Harp facility, the question of how these inmates are to be treated on a long term basis is not addressed by the medical plan nor are there any plans to answer the staffing requirements of such a population.

Lack of medical staff is also evident in the infirmary at Lexington A & R, where there is no nursing coverage either during the day or night.

19. The staffing requirements of a penal facility depend on a number of factors, among which are the size of the service population; the turnover rate of population; the security designation of the facility; and the character and age of the population. As a general rule, the following provides for minimally adequate staffing:

Central Administration
1. Medical Director
2. Deputy Medical Director (preferably, a psychiatrist)
3. Medical Records Librarian
4. Dietician
5. Registered Pharmacist
6. Secretaries and clerks (6)
7. Dental services consultant (½ time)
8. Rehabilitation Medicine (Psychiatrist) Consultant (¼ to ½ time)

Based on current populations, the individual prisons need the following staff.

(A) Lexington Assessment and Reception Center

| | | |
|---|---|---|
| 1. | Medical Director | (1) |
| 2. | Staff Physician | (1) |
| 3. | Physician's Assistant | (4) |
| 4. | Registered Nurse | (5) |
| 5. | Licensed Practical Nurse | (11) |
| 6. | Corrective Medical Specialist | (6) |
| 7. | Physiotherapist | (1) |
| 8. | Nutrition Technician | (1) |
| 9. | Dentist | (2) |
| 10. | Dental Assistant | (2) |
| 11. | Dental Laboratory Technician | (2) |
| 12. | Registered Pharmacist | (1) |
| 13. | Pharmacy Technician | (2) |
| 14. | Psychiatrist | (1) |
| 15. | Clinical Psychologist | (1) |
| 16. | X-ray Technician | (1) |
| 17. | MSW Social Worker | (2) |
| 18. | Optometrist | (½) |
| 19. | Medical Administrator | (1) |
| 20. | Medical Records Technician | (1) |
| 21. | Secretary | (3) |
| 22. | Clerk-Typist | (3) |

(B) Oklahoma State Penitentiary

| | | |
|---|---|---|
| 1. | Medical Director | (1) |
| 2. | Staff Physician | (1) |
| 3. | Physician's Assistant | (2) |
| 4. | Registered Nurse | (5) |
| 5. | Licensed Practical Nurse | (5) |
| 6. | Correctional Medical Specialist | (5) |
| 7. | Nutrition Technician | (1) |
| 8. | Dentist | (3) |
| 9. | Dental Assistant | (3) |
| 10. | Dental Laboratory Technician | (2) |
| 11. | Registered Pharmacist | (1) |
| 12. | Pharmacy Technician | (3) |
| 13. | Psychiatrist | (1) |
| 14. | Ph.D. Clinical Psychologist | (1) |
| 15. | MSW Social Worker | (1) |
| 16. | X-ray Technician | (1) |
| 17. | Optometrist | (¼ to ½) |
| 18. | Medical Administrator | (1) |
| 19. | Medical Records Technician | (1) |
| 20. | Secretary | (2) |
| 21. | Clerk Typist | (2) |

(C) Lexington II, Granite, Hodgens, McLeod, Stringtown, Hominy:

1. There should be a physician full-time for each 500–600 inmates.

2. There should be additional ancillary staff such as physician's assistants, nurses, correctional medical specialists, etc., to provide 24 hour/day, 7 day/week service.

3. A full time dentist with a full time assistant is required for each 500 inmates.

4. A medical records technician is required for each 500 inmates.

5. A nutrition technician full-time is required at Lexington II, Granite, and Stringtown; part-time at other institutions.

6. A part-time pharmacist and full-time pharmacy technician is required at each institution.

7. Dental laboratory services must be made available either from a central location or locally by contract.

8. X-ray services must be available. Utilizing local resources would probably be most practical.

9. Laboratory services, probably through local resources, must be available.

10. A medical administrator is required at Lexington II, Granite and Stringtown-McLeod. A secretary with these responsibilities designated would be sufficient at Hodgens and Hominy.

11. An optometrist part-time must be available to each institution.

12. Mental health services, utilizing psychologists, social workers and paraprofessionals, supervised by a psychiatrist, must be available in each institution.

13. Adequate secretarial support is essential; one full-time for each 250 inmates should be adequate.

14. A psychiatric nurse, psychiatric social worker or clinical psychologist.

20. As is indicated above with regard to the staffing problems at Trusty Dorm 1, the defendant's Health Plan fails to adequately deal with the question of specialized medical care. Such care is necessary for inmates with chronic diseases or permanent disabilities, who do not require hospitalization, but must have nursing care or close supervision. The current plan calls for placing some inmates in local private nursing homes. This plan fails to account for those inmates who cannot be so placed due to their security status. The evidence further showed that the defendants are considering utilizing one of the 80 man cell blocks at the Joe Harp facility for such purposes. Yet, no explanation has been given as to how the architectural problems presented by this two story structure can be overcome.

21. The nutritional services, which are integral to the treatment of many medical problems, have not been given sufficient consideration by the Department's plan. There is no comprehensive program to insure the proper delivery of such diets, as well as their planning and preparation.

22. The Department continues to utilize inmate help in the medical service area. The use of such inmates presents special problems in that some inmates may abuse their position for personal gain or may be subject to pressure from other inmates for special favors. At the present time, there are no safeguards in the Department's Plan to insure that abuses do not occur.

23. The Department has failed to provide sufficient continuity of care, monitoring and follow-up medical disorders for those inmates in need of such treatment. The record established that numerous inmates failed to receive follow-up medication or treatment which was required after diagnosis.

24. The inadequacies in the health care system have contributed to death, pain, permanent injury and unnecessary suffering to the inmates incarcerated in the Department of Corrections.

a. Inmate Byron Barnhardt died of a heart attack in February, 1978. He was timely discovered in his cell and taken to the infirmary, weak but conscious.

He was not given the proper medication because one prison medical employee couldn't find the key and another thought the medication was banned.

He was not given oxygen because the equipment was not working.

He was delayed in transmission to the free world hospital because prison employees could not find the "proper stretcher".

Defendants' own expert described the choice of medication given to Barnhardt as negligent.

b. Inmate Nathaniel Toles tried from August to October, 1977, to seek medical attention for a foot problem. He received no thorough examination until a non-medical staff person requested that he be referred for a consultation.

Subsequent gangrene set in and his right leg was amputated below the knee.

A prosthesis was ordered on April 7, 1978. As of August 7, 1978, it had not been fitted.

c. Inmate Douglas Smith, on April 5, 1978, was evaluated by a Department of Mental Health psychiatrist for hallucinations and paranoid verbalizations. It took one month after the diagnosis for him to be transferred.

d. Inmate Richard Setzer had sufficient symptoms to be referred to an optometrist in December, 1977, and on April, 1978. He did not receive glasses until after his second appointment. At one time during this period, he was further recommended for referral to the Neurology Clinic at either Central State or University Hospital. That appointment was subsequently cancelled.

e. Inmate Marshall Cummings had complained about a dandruff and loose hair problem to the medical authorities on several occasions prior to his being seen by the plaintiff-intervenor's medical expert in late April, 1978. It wasn't until July 11, 1978 that he was finally thoroughly examined and it was determined by prison medical authorities that his problem wasn't medical, but rather hereditary.

f. Inmate Alan Livingston, according to the defendants, has had epigastric (ulcer) burning and pain, belching and regurgitation and headaches for seven years. His only treatment has been aspirin and various antacids. Four months after Dr. Rundle's visit, the DOC medical staff has "plans to evaluate Mr. Livingston's long term complaints at weekly intervals with appropriate documentation of physical findings and diagnostic test". (See defendants' Response to Joint Compliance Report at page 31.)

g. Inmate Andrew Hendricks stated to Dr. Rundle in April, 1978, that he had been waiting 7 months for a dental plate. In August, 1978, the defendants stated that the plate "was on order".

h. Inmate James Neal has a physical infirmity which requires a leg brace. He had a leg brace while incarcerated at Granite. On March 3, 1978, he was transferred to McAlester. His brace was not. Prison medical officials at McAlester inquired about this matter on March 16, March 22, March 24, and May 3, 1978. The brace was not received until June 5, 1978.

i. Dr. Rundle made several other observations of inadequate medical care in his report which has been filed with the

Court. In some of these cases, defendants did not even venture to offer a reply in their Response to the Joint Compliance Report. In other cases, they made a response and the actual resolution of the issue depends on a thorough examination of the medical records. No party presented the Court with said evaluation or testimony during the August 14, 15, 1978, hearing.

## IV. *Access to Courts*

To be meaningful, the right of access to the courts must include the means to frame and present legal issues and relevant facts effectively for judicial consideration. *Battle I*, at 426.

25. All inmates committed to the care of the Department of Corrections do not have adequate access to the courts as was ordered by this court in its original order of 1974. The only minimally adequate law library available for inmate use is located behind the walls at McAlester. The other law libraries fall below minimally acceptable standards.

26. In order to have access to an adequate law library, prisoners at other facilities must request a transfer to McAlester to utilize the library there. In the case of prisoners with medium or minimum security classifications, substantial deprivation of privileges due to the maximum security nature of McAlester attend such transfers.

27. Inmate access to the McAlester law library does not result in meaningful access to the courts. According to the undisputed testimony of Robert J. Griffith, law librarian at McAlester, most inmates are allowed to use the library for no more than two hours a week. Under the immediate past warden, inmates at McAlester were discouraged from filing civil suits against the administration. Inmate law clerks may not type writs for other inmates. Only designated inmate law clerks may provide legal assistance to other inmates, and there are inadequate numbers of designated inmate law clerks to fill this need.

28. Only 30% of the inmates have the intelligence and education to do any legal research. The other 70% must depend entirely upon inmate legal assistance to prepare and process their legal papers and research.

The law librarian acknowledges that he has no formal training in the law or as a law librarian and that his assistance to inmates is therefore limited to helping them locate books. There are no attorneys or other legal support personnel provided to assist inmates. Many inmates flood the courts with actions which have no chance of success simply because no one with expertise is available to so advise them.

29. Inmates are prohibited by department regulations from maintaining more than two manila envelopes of legal materials in their cells. Inmates have been written up and disciplined for maintaining more than two manila envelopes or for having the pleadings of another inmate, as well as for assisting one another in the preparation of legal documents.

30. This Court, in October, 1976, stated from the bench that defendants' provisions for inmate access to the courts were not adequate or in compliance with his prior order.

## V. *Racial Segregation and Discrimination*

. . . At the present time the housing units are not racially segregated. . . Accordingly, there is no present assurance that housing units will not become resegregated when normal operations are restored. *Battle I*, at 411.

Racial discrimination in any aspect of the operations of the Oklahoma State Penitentiary shall cease forthwith and forever. *Battle I*, at 428.

31. In March, 1974, individual cells at McAlester were integrated. The warden of McAlester was deposed on May 4, 1978. At that time, there were no integrated cells at McAlester out of approximately 400 multi-person cells. In August, 1978, there were no integrated cells out of the approximately 300 multi-person cells.

At McAlester, an inmate's classification determines his cell block. Once assigned to

a cell block, the cell house lieutenant assigns the inmate to his cell. Inmates of the same race are normally given no choice of cell mate. At Granite, in August, 1978, there were integrated cells.

32. In the May 30, 1974 opinion, defendants were ordered to take affirmative steps including the hiring of minority staff to eradicate the abuses of past discrimination and segregation. At the administrative level, and in certain of its divisions, the Department of Corrections has fully complied with that portion of the 1974 order. However, at some of the prisons, the proportion of minority staffers is still inadequate, e. g., McAlester 5%, Granite 2.3%, Hodgens 2%, and McLeod 5%. Further, these figures are misleading in that they represent the total minority black staff at the above prisons. They include security, maintenance, administrative and clerical staff. They include staff which both has contact with inmates and which does not have contact with inmates. The proportion of black employees at McAlester having any direct control or supervision over the inmates is significantly less than 5%.

33. Vestiges of racial discrimination in inmate job assignments still exist within the Department of Corrections. In each quarterly report, the defendants still state that some jobs are out of balance and that some living quarters are out of balance. Each time they admit that some of this balance is not justifiable and will be corrected.

Although, for any given report, the excuse of lack of available persons with the necessary skills may be valid, when the same excuse is given in submission after submission, the credibility of it wanes.

## VI. *Use of Force*

As is the case with any use of physical force against inmates, the use . . . must never exceed that reasonably required to effect the legitimate ends of penitentiary officials. Accordingly, the use . . . on the rationale that the actual situation is one which could develop into—although it has not yet become—one in which the use of such agents is permitted, constitutes the excessive use of physical force and is prohibited both by . . . departmental policy . . . and by this Order. *Battle I,* at 433.

34. There has been excessive use of force on the part of the defendants. This court, in its initial Order of 1974, found that the defendants were utilizing chemical agents and physical force as punitive measures against inmates rather than as a control device. Such use of force is prohibited by statute in Oklahoma and was found to be a violation of the Eighth Amendment to the United States Constitution.

35. No incidents in regard to the improper use of chemical agents are revealed by the record nor did the Joint Compliance Report set forth any allegations as to use of chemical agents. However, numerous incidents involving altercations between inmates and guards and use of force by guards upon inmates have been reported. A significant number of incidents occurred on the disciplinary unit at the Oklahoma State Penitentiary at McAlester during the winter months of 1977 and 1978. Accepting the Department's version of how these incidents started, the force used was excessive. Several of the incidents involved removing recalcitrant inmates from their cells or seizing contraband from an unwilling inmate. In these incidents, the inmates were either punched or struck with instruments known as slappers. (A slapper is a weighted leather instrument about one foot long.) Both Warden Hess and Mr. Sarver testified that such force was unnecessary. Warden Hess testified that the proper procedure for handling such inmates would be for guards equipped with riot shields to enter the cell, move the inmate into a corner and then bring the inmate under control. According to Warden Hess, the guards are no longer allowed to carry slappers and riot shields will soon be available for use.

36. The Department has promulgated policy and operations memoranda with regard to the use of force. It is the policy of the Department to use force to the mini-

mum degree necessary and that no person is to use physical force upon a prisoner except in self-defense, to prevent injury to persons, or to quell a disturbance.

The continued abuse of force by the department is not due to the failure of the Department to promulgate basic written policies concerning the use of force. However, the Department's operations memorandum has not insured proper implementation by on-going training, personnel policies which require the dismissal of guards for abuse of force or by the standard rotation of guards from the type of duty encountered on the disciplinary units.

37. Despite the statements of the warden indicating the proper method in which to handle these types of incidents, no disciplinary proceedings have been undertaken against any guards; no guards have been identified as being in need of further training; and none of the guards in question were transferred from their work assignment as a result of these incidents.

38. Subsequent to plaintiff and plaintiff-intervenor's inquiries about the guard-inmate altercations occurring at McAlester, the defendants changed their policy statement on this matter. Now, a departmental review and written evaluation of each major employee-inmate incident is required.

VII. *Due Process*

To insure that no inmate is punished in violation of the provisions of this paragraph through a process of denominating the procedure employed "administrative," rather than "disciplinary" in nature . . *Battle I*, at 431.

39. The rules and regulations promulgated by defendants with regard to disciplinary procedures are in accord with this Court's prior order. The Joint Compliance Report has further commended the defendants for certain aspects of the due process system, such as the taping of all major hearings and their submission to an independent hearing examiner.

40. Despite the defendant's paper compliance with this court's order, there appear to be shortcomings in implementation.

Any punishment of inmates through a process denominated administrative rather than disciplinary is prohibited under this court's prior order. Differentiating the two where prison administrators are intent upon circumventing the court's order is admittedly difficult.

A large number of inmates were recently transferred from McLeod after a series of fires. Those transferred were not subject to any charges and the transfers were purportedly administrative. However, the transfers resulted in the inmates being placed back in the maximum security institution at McAlester.

These transfers have two effects on the inmate. First, a transfer to McAlester from a community treatment center or minimum or medium security facility results in a significant reduction of privileges, effectively precludes the inmate from any participation in educational, and vocational programs, and probably means that the inmate will not be able to work. Secondly, assignment to McAlester behind the walls is a maximum security designation. Parole boards are much more likely to parole minimum security inmates than maximum security. This tendency must be even more pronounced when the parole board notices that the inmate in maximum security had previously been designated minimum security.

Due to the serious questions which have arisen concerning the implementation of these new rules, the court will continue to subject the defendants to scrutiny on this issue in the future.

VIII. *Religious Freedom*

Defendant shall forthwith cease all unreasonable interference with the provision to inmates of spiritual counseling and the opportunity to engage in group religious services. *Battle I*, at 436.

41. From September, 1975, until the date of the hearing on this matter, there has been a continued denial and undue interference with the rights of the Native American inmates at McAlester to exercise their religion.

42. A new Operations Memorandum concerning the practice of religion by inmates, effective August 4, 1978, will apparently dispose of this problem. Inmates desiring to meet on a group basis for native religious, cultural or spiritual purposes will now be permitted to do so pursuant to appropriate regulation by the warden. The policy also allows individual access to spiritual leaders, use of religious paraphernalia and the receipt and possession of religious literature for all inmates.

Warden Hess further testified that the Chaplain has undertaken to obtain a medicine man to provide such services for the inmates and that services are expected to begin in the near future.

43. The Court's May 30, 1974, order also dealt specifically with the problems of Black Muslim (now known as the World Community of Islam) inmates in freely exercising their religion. The Joint Compliance Report finds in regard to this issue that the defendants have substantially complied with the Court's order in this area. Several complaints have been made by individual inmates concerning an inability to receive the diet required of their faith. However, there is no indication that there is any systematic attempt on the part of the defendants to deprive these inmates of their religious freedom.

### IX. *Mail and Publications*

Because of its impact on the First Amendment rights of "free world" as well as inmate correspondents, however, the censorship of such mail must meet the constitutional standards which are generally applied to governmental regulation of protected speech. *Battle I*, at 425.

44. The defendants' policies and practices with respect to mail and literature rights and privileges afforded inmates generally comply with this Court's order. Again, individual complaints concerning failure to receive certain publications or mail continue to be registered. However, these problems are not the result of any systematic effort on the part of defendants to deny the inmates their rights.

45. One area of noncompliance is found in the defendants' rule prohibiting inmates from retaining any correspondence in their cells for more than 5 days. Warden Hess testified that such a rule was necessary for fire protection since some inmates in the past have burned accumulations of paper. The logic of the rule is faulty, however, since inmates are allowed to keep two manila envelopes of legal materials. While the defendants may regulate the accumulation of materials in cells, the regulation here bears no relationship to the end it seeks to achieve. If an inmate prefers to keep two manila envelopes of letters from loved ones, rather than legal materials, the fire danger cannot be appreciably increased. Further, the inmate is allowed any amount of letters or newspapers as long as the time limitation is not violated.

### CONCLUSIONS OF LAW

1. The hearing on August 14, 15, 1978 was not a trial in the normal use of the term. Rather, it was an evidentiary compliance hearing to determine if the defendants were in compliance with this Court's prior orders (May 30, 1974), 376 F.Supp. 402 (E.D.Okl.1974) and June 14, 1977, 447 F.Supp. 516 (E.D.Okl.1977), aff'd, 564 F.2d 388 (10th Cir. 1977). The basic and underlying conclusions of law have been set out in the above cited cases. The hearing did not focus on the existence of constitutional violations, for those had already been found in *Battle I* and *II, supra*, but rather was an audit of compliance with the prior orders, and an appraisal of the possible remedies to be required from the defendants in order to effectuate those orders.

2. The Supreme Court has recently reaffirmed in a prison case that, once invoked, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies, *Hutto v. Finney*, —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978 # 76–1660). *See also, Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53

L.Ed.2d 745 (1978), *Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977) and *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977). In civil rights matters, "as with any equity case, the nature of the violation determines the scope of the remedy." *Swann v. Board of Education*, 402 U.S. 1, at 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

3. This Court has twice issued formal findings of facts, conclusions of law and orders finding the defendants in violation of the Constitution. *See, Battle I* and *Battle II, supra*. Further, in October 1974, April 1975, May 1976, October 1976, this Court found that defendants were not in compliance with its prior order in *Battle I*. In the May 1977 hearing, this Court in part dealt with non-compliance of *Battle I* issues, but largely dealt with the issues which lead to *Battle II. See, Battle II* at 517, fn. 2.

■ 4. From the Findings of Fact it is clear that defendants are violating the constitutional rights of persons incarcerated in the Department of Corrections. It is equally clear that defendants are not now in compliance with this Court's prior orders. Other Courts, when faced with this type of problem, have reacted in different ways. Remedies which have been adopted in the penal context include:

a. Closing of penal facilities or portions thereof. *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974), *aff'd*, 507 F.2d 333 (2nd Cir. 1974); *Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1974), *aff'd*, 501 F.2d 1291 (5 Cir. 1975) and 407 F.Supp. 1117 (N.D.Miss.1975), 548 F.2d 1241 (5th Cir. 1977); *Battle I* at 432; and *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977).

b. Ordering additional injunctive relief. *Holt v. Sarver*, 300 F.Supp. 825 (E.D.Ark. 1969) (*Holt I*); *Holt II*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd, Holt v. Sarver*, 442 F.2d 304 (8th Cir. 1971); *Holt v. Hutto*, 363 F.Supp. 194 (E.D.Ark.1973) (*Holt III*), *rev'd in part sub nom. Finney v. Arkansas Board of Corrections*, 505 F.2d 194 (8th Cir. 1974); *Finney v. Hutto*, 410 F.Supp. 251 (E.D.Ark. 1976), *aff'd*, 548 F.2d 740 (8th Cir. 1977),

*aff'd sub nom., Hutto v. Finney*, —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522; *Palmigiano, supra, Battle II, supra*.

c. Mandating population reductions. *Battle II, supra; aff'd* 564 F.2d 388 (10th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Costello v. Wainwright*, 525 F.2d 1239 (5th Cir. 1976), *rev'd for consideration by three judge court*, 539 F.2d 547 (5th Cir. 1977), *rev'd and remanded re three judge issue*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1978).

d. Prohibiting or curtailing admittance to the facility(s). *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd sub nom., Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert. den.* —— U.S. ——, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Williams, supra*.

e. Appointing of special masters to insure compliance. *Pugh, supra; Jones v. Wittenberg*, 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977); *Taylor v. Sterrett*, 344 F.Supp. 411 (N.D.Tex.1972), *aff'd in part, rev'd in part*, 499 F.2d 367 (5th Cir. 1974), *cert. den.* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975).

f. Contempt and significant fine. Many courts have stated a willingness in this context to either assess punitive damages against defendants or, if no damages were sought, to assess contempt fines. The highest contempt fine to date is $250,000.00 coupled with a damage assessment of $75,-000.00 against Philadelphia city officials for violating a stipulated agreement. *Jackson v. Hendricks*, Pa.C.P.Phila., 1972, *aff'd*, 457 Pa. 405, 321 A.2d 603 (1974), at subsequent proceeding (1978), 22 Cr.L. 2356 (1978).

I. *Overcrowding*

5. The Court hereby readopts it conclusions of law on this point as set out in *Battle II*, and in the Circuit's affirmance, *supra*.

## II. Conditions of Confinement

6. The Court hereby readopts its Conclusions of Law on this point as set out in *Battle II* and in the Circuit's affirmance, *supra*.

## III. Health Care Services

■ 7. The basic right of inmates to receive needed medical care while they are confined in prison is indisputable. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977). As this court has previously held:

"As a necessary corollary of that right, prison officials have an affirmative duty to make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." 376 F.Supp. at 424.

8. The findings of this court establish a continuing failure on the part of the defendants to promulgate a plan to meet the routine and emergency health needs of inmates.

The shocking cases of medical neglect reviewed by the court bear out the validity of the Supreme Court's opinion in *Estelle v. Gamble, supra*, recently reiterated by the 10th Circuit in its affirmation of *Battle II, supra* at 402, wherein the Court stated:

An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler* (136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519,) *supra*, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. *Gregg v. Georgia, Supra*, (428 U.S. 153 at 171–74, 96 S.Ct. 2909 at 2924–25, 49 L.Ed.2d 859) (plurality opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the commonlaw view that "(i)t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself."

9. Once again, the Court is confronted with an issue where the remedy must be fashioned to the violation. *Swann v. Board of Education, supra.* Here, again, the violation is not simply the denial of the medical care required by the constitution, it is also a marked intransigence on the part of the defendants to conform to the requirements laid out by this court more than four years ago. To be sure, the defendants have progressed toward their ordered goal, yet the care remains so woefully inadequate that the Court cannot ignore its obligation to insist upon stringent steps to end this constitutional violation.

## IV. Access to Courts

■ 10. The fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing inmates with adequate law libraries or adequate assistance from persons trained in the law. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). States must shoulder affirmative obligations to assure all prisoners meaningful access to the courts. While the Supreme Court in *Bounds* held that law libraries are one constitutionally acceptable method of assuring access to the courts, the Court's opinion discusses in detail the alternative programs for achieving that goal. According to the Court:

"Among the alternatives are the training of inmates as para-legal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or

legal services offices. Legal services plans not only result in more efficient and skillful handling of prisoner cases, but also avoid the disciplinary problems associated with writ writers, see *Johnson v. Avery*, 393 U.S. 483, at 488, 89 S.Ct. 747, 21 L.Ed.2d 718; *Procunier v. Martinez*, 416 U.S. 396, 421, 422, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1977). Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate he has not been treated unfairly." 430 U.S. at 831, 97 S.Ct. at 1500.

11. A federal court using the alternatives set out in *Bounds* must fashion a remedy which, under the circumstances found in a particular case, will provide meaningful relief. *Hutto v. Finney, supra; Newman v. State of Ala.*, 559 F.2d 283, 288 (5th Cir. 1977). This problem has been before this court more than 4 years. The Court's experience with the problem has convinced it that defendant's reliance merely on law libraries cannot ameliorate the inmates' lack of meaningful access to the courts. Clearly, then under *Bounds*, this court has an obligation to take additional steps to insure that the defendants comply with the Court's earlier order.

12. In *Hutto v. Finney, supra*, the question before the trial court was whether past constitutional violations had been remedied. The same situation confronts this Court and here, as there, the Court has "ample authority to go beyond earlier orders and to address each element contributing to the violation."

The law librarian at McAlester has established that the mere presence of a minimally adequate library at that institution has not provided meaningful access for a majority of the inmates—perhaps 70%. The rec-

ord shows a conscious effort to intimidate those inmates capable of initiating actions on their own from doing so. Further, the administration continues to arbitrarily limit the amount of legal material an inmate may keep in his cell, and contrary to the decision in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the defendants have prohibited inmates from assisting each other in the preparation of legal matters.

## V. *Racial Segregation and Discrimination*

13. The Court hereby readopts its Conclusions of Law as set out on this issue in *Battle I.*

[8] 14. As to the issue of in-cell segregation, the Court originally ordered the defendants to come up with a racially neutral housing system. The issue before the Court is a factual, not a statistical, issue of segregation. Zero is zero.

The Supreme Court in *Castaneda v. Pastida*, 430 U.S. 482 at 496 fn. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), approved the use of statistics for presentation of *prima facie* cases. The Court set the standard as 2 or 3 standard deviations. With 2 standard deviations, there is only a 5% chance that the observed incident is caused by chance. With 3 standard deviations, there is only a 1% chance. This use was reaffirmed this year in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

Based on the *Castaneda-Hazelwood* test, one would anticipate 133 [4] mixed cells. Each standard deviation is approximately 8. If the number of mixed cells is less than 100 (4 standard deviations) the chance of this happening randomly is less than 1 in a thousand.

Therefore, as a Conclusion of Law, the Court will initially hold that there is a rebuttable presumption of racial discrimination if the number of mixed cells is more

---

**4.** The following assumptions were utilized.

  a) 300 multiperson cells at McAlester.

  b) That each cell only contained 2 persons. If one took into account the existence of 3

man cells, then the expected number of mixed cells would be much larger.

  c) That the prison was $2/3$ non-black and $1/3$ black.

than 4 standard deviations from the expected.

## VI.  Use of Force

15. On the issue of use of force, the Court hereby readopts its Conclusions of Law on this point as set out in *Battle I.*

## VII.  Due Process

16. On the issue of due process, the Court hereby readopts its Conclusions of Law on this point as set out in *Battle I.*

■ 17. The treatment of prisoners in protective custody presents a serious question involving aspects of cruel and unusual punishment as well as due process. (These inmates are in protection because they could not cope with the stresses of general population.) The inmates are housed in one of the hottest areas on the top floor of the West Cell House, two to a cell, with no outdoor exercise and time out of the cell averaging no more than two hours per day. While these inmates are not being disciplined, these conditions are punitive in nature and would not be allowable even if the inmates were being subjected to disciplinary sanctions. To house inmates who get only 2 hours of the day outside their cells in the most primitive conditions in the entire prison system is certainly a violation of constitutional prohibitions against cruel and unusual punishment and due process.

## VIII.  Religion

■ 18. The state has the burden of justifying policies or practices which prevent inmates from engaging in religious or spiritual practices which do not present a threat to the security, discipline and good order of the institution. *Battle I, supra* at 427, and cases cited therein.

■ 19. Native American inmates desiring to have traditional tribal religion, spiritual or cultural services (which shall include access to spiritual leaders on a group and individual basis, access to religious paraphernalia such as gourds, beads, feathers and drums and access to religious literature) should be afforded the same opportunity for the exercise of their religion as other inmates.

## IX.  Mail and Publications

■ 20. Prison mail restrictions must further an important governmental interest unrelated to the suppression of speech, and the restrictions should be no greater than are necessary or essential to the protection of the particular governmental interest involved. *Battle I, supra* at 425; *Procunier v. Martinez, supra.*

■ Restrictions on length of time mail may be retained by inmate is arbitrary and an impermissible restraint on inmates' rights of correspondence, especially where such regulations are based on a purported desire to prevent accumulations of flammable materials—yet inmates are allowed two manila envelopes of legal papers.

## ORDER

Based upon the Memorandum Opinion filed herein the 8th day of September, 1978,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

## I.  Overcrowding

1. By April 1, 1979, each inmate in the Oklahoma State Penitentiary at McAlester, Oklahoma, (hereinafter referred to as McAlester) and in the Oklahoma State Reformatory at Granite, Oklahoma, (hereinafter referred to as Granite) shall be housed one to a cell.

2. By August 1, 1979, each inmate in the other prisons within the system shall be housed in at least 60 square feet· if said inmate lives in a cell or room and at least 75 square feet if said inmate lives in a dormitory.

## II.  Conditions of Confinement

3. By December 1, 1978, the wooden dormitories shall be closed to habitation.

4. By July 1, 1979, funds must be appropriated for the construction of replacements of the East and West Cell Houses at Granite and McAlester or if suitable funds have

not been appropriated or obtained through grants, then those facilities shall be closed to further habitation.

5. By November 1, 1979, ground must be broken for construction of new housing units at McAlester and Granite or the East and West Cell Houses shall be closed to further habitation.

6. By May 1, 1981, the East and West Cell Houses shall be permanently closed for habitation.

7. By January 1, 1979, defendants shall present to the Court a Life Safety Code audit of the facilities of the Department of Corrections.

8. By April 1, 1979, the items listed in the Life Safety Report shall be corrected.

9. By December 1, 1978, defendants shall have a full environmental audit done on each facility according to the standards announced by the American Public Health Association and the American Correctional Association.

10. By December 1, 1979, defendants shall come into compliance with the above mentioned standards in all institutions except McAlester and Granite.

11. By July 1, 1979, defendants shall have their water, sewage, plumbing, electrical systems at each of their facilities in compliance with the applicable State Department of Health regulations.

### III. *Health Care Delivery System*

12. By December 1, 1978, the defendants shall promulgate a health services plan that conforms to the standards adopted by this Court in its findings of fact.

13. By July 1, 1979, defendants shall secure the necessary authorization to adequately staff the plan.

14. By November 1, 1979, defendants shall be in compliance with the plan.

15. Defendants shall immediately provide 24 hour nursing care for inmates in Dormitory 1; institute daily visits by physician's assistants; and institute weekly visits by physicians.

16. At this time, the Court postpones consideration of appointing a special master to oversee the implementation of adequate health care services. Plaintiffs and plaintiff intervenors may file a formal motion for such relief accompanied by the reasons such a special master may be necessary and useful.

### IV. *Access to the Courts*

17. By September 1, 1979, defendants shall provide competent civilian legal advisors in sufficient numbers to insure inmates the means to frame and present legal issues effectively for judicial consideration.

18. By November 1, 1978, defendants shall establish a second major law library at a medium or minimum security prison within the system.

19. No inmate within the system in Community, minimum or medium security shall be forced to undergo the loss of privileges concomitant with a transfer to McAlester for the use of adequate law library facilities.

20. The use of inmates as paralegal assistants may continue. If defendants choose to continue with the use of inmate paralegals instead of civilian paralegals, these paralegals shall be given training in legal research.

21. The Court reminds defendants that in its May 30, 1974, Order, it forbade the prohibition of inmate-inmate self help on legal matters unless other alternatives were available.

22. By December 1, 1978, defendants shall come up with a new policy on the amount of legal materials and other personal effects which each inmate is allowed to keep in his cell, and a policy for the storage of a reasonable amount of excess materials.

### V. *Racial Segregation and Discrimination*

23. The prior orders regarding racial segregation and discrimination are still in effect.

24. By January 1, 1979, defendants shall have, at all institutions except McAlester, their multi-celled cells (defined as cells or

rooms having more than one person) within four standard deviations of what could be expected ·if the celling in multiperson cells was done strictly at random. If this is not accomplished, the defendants will be required to present a detailed explanation as to their inability to achieve this goal. The progress in achieving this goal shall be reported in the quarterly racial submission.

### VI. *Use of Force*

25. Defendants shall immediately comply with their own operations memorandum in regard to use of force against inmates. A copy of the Departmental level evaluation of each major inmate-employee altercation shall be filed with the Court and the parties, as are the reports of use of chemical agents.

26. Whenever an abnormal number of incidents of force are identified as occurring during a particular shift or location, immediate steps shall be taken to isolate the causes of such incidents. The Court recommends that defendants consider the periodic rotation of guards from hazardous or onerous duty locations such as the disciplinary units.

### VII. *Due Process*

27. The prior orders regarding due process remain in effect.

28. By January 15, 1979, the defendants shall promulgate and present to the court a plan to insure that the inmates held on protection are afforded treatment which will not subject them to cruel and unusual punishment and lack of due process which has resulted from their near continuous confinement to their cells with no opportunity for work or adequate recreation.

### VIII. *Religious Practices*

29. The defendants' new operation memorandum in regard to religious practices, OP–090301, is approved. Defendants shall immediately conform to the procedures set forth in this memorandum.

### IX. *Mail and Publication*

30. The defendants shall continue compliance with their present operation memorandum in this area.

31. Restrictions on the length of time an inmate may retain correspondence will be considered arbitrary unless an imminent danger can be shown from past or threatened conduct of an inmate.

32. A copy of the Court's decisions in this case shall be made available for inmates by posting in each institution's library or other appropriate place.

This Order and accompanying Memorandum Opinion shall be filed with the Clerk of the United States District Court for the Western District of Oklahoma and thereafter refiled with the Clerk of the United States District Court for the Eastern District of Oklahoma.

*For I was hungred, and ye gave me meat: I was thirsty, and ye gave me drink: I was a stranger, and ye took me in: Naked, and ye clothed me: I was sick and ye visited me: I was in prison, and ye came unto me.* St. Matthew 25:35–36