Bobby BATTLE, et al., Plaintiffs,

and

United States of America,
Plaintiff-Intervenor,

v.

Park ANDERSON, Larry Meachum, Director, Dept. of Corrections; Board of Corrections For the State of Oklahoma, and Members Thereof, et al., Defendants.

No. 72–95–CIV.

United States District Court,
E. D. Oklahoma.

May 5, 1982.

Louis W. Bullock and Carl G. Stevens, Tulsa, Okl., Mary E. Bane, Oklahoma City, Okl., for plaintiffs.

William B. Rogers, Oklahoma City, Okl., for plaintiff counsel.

Jan Eric Cartwright, Atty. Gen., State of Okl. by Robert Nance and Charles Rogers, Asst. Attys. Gen., Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

BOHANON, District Judge.

Plaintiffs' motion for attorney fees came before this court on March 8, 1982.

The attorneys fee applications herein at issue were initially filed September 25, 1980. The applications sought compensation for the entire period of representation of attorneys Bullock, Stevens, and Bane, except for an interim request of 493 hours during a period from October, 1975, through 1977.[1] The amount of the applications (as amended) had a total base fee request of approximately $280,700, with expenses of approximately $17,300. The applicants also indicated a desire for an enhancement factor of from 40 percent to 100 percent. Thus, the amount of the request at the time of the March 8, 1982, hearing was somewhere between $400,000 and $580,000.

---

**1.** This request and award were extensively discussed in *Battle v. Anderson*, 614 F.2d 251, 256 (10th Cir. 1980). In fact, this court's award of $60 per hour for services rendered by Mr. Bullock for this time period has been cited by numerous courts. *See*, e.g., *Gurule v. Wilson*, 635 F.2d 782, 793 (10th Cir. 1980) where the court found a lesser award "parsimonious."

This court's first consideration of these requests resulted in a letter to plaintiffs' counsel dated November 17, 1980. In reviewing the applications, the court stated its surprise as to "the amount of the claims and the long delay in filing them." It was also noted that it was going "to have to follow a new and different policy with reference to representation of this class."[2]

Then on November 26, 1980, the court sent another letter to counsel for the plaintiffs with the considered statement that in light of the "amounts involved" this matter should be presented to an advisory jury under the provisions of Rule 39(c), Federal Rules of Civil Procedure. Upon consideration of the significant questions involved, the simple procedural hearing originally scheduled for December 5, 1980, was struck and pretrial preparations were directed.[3]

Due to various intervening issues, appeals, and administrative delays, the matter of attorney fees was postponed until November 23, 1981, when pretrial proceedings were again commenced. It was determined during these proceedings that an advisory jury was not necessary, and hearing was set for March 8, 1982.

At the date of hearing, the total relief sought by the plaintiffs' counsel consisted of payment for:

1. 994 hours expended by Ms. Bane from August, 1972, through March 4, 1982.

2. 874.95 hours expended by Mr. Stevens from December, 1977, through March 4, 1982.

3. 1,732.50 hours expended by Mr. Bullock from December, 1977, to March 4, 1982.

4. 16 hours expended by Mr. Gary Neal as assistant to Mr. Bullock.

5. Out-of-pocket expenses of the American Civil Liberties Union expended in connection with this litigation in the amount of $1,167.90.

6. Out-of-pocket expenses of the ACLU National Prison Project in the amount of $517.74.

7. Out-of-pocket expenses of Ms. Bane in the amount of $121.23.

8. Out-of-pocket expenses of lead counsel during this period of $12,402.93.

9. Out-of-pocket expenses of Carl G. Stevens for the incident period of $2,255.53.

During the hearing of this matter, numerous experts testified regarding the reasonableness of the request for attorney fees. Particularly helpful in this area was the testimony of Mr. Robert S. Baker. Mr. Baker's testimony was persuasive on the prevailing local rates of attorney compensation during the application period.

Having heard the evidence presented, this court is compelled to enter the following findings of fact and conclusions of law.

---

**2.** The total amount of requested compensation was in excess of 3,000 hours. This amount included approximately 1,000 hours *accumulated but not billed* prior to the initial consideration of attorney fees in 1978.

**3.** It must be pointed out that at this stage of the proceedings the request for reimbursement included hours spent on the compliance stages of the litigation under cooperative State administrations that amounted to more than double the hours expended in Phase I. Phase I pioneered the frontier of prisoners' rights and difficult litigation involving hostile or complacent State officials. This fact greatly concerned the court. While this court is clearly not adverse to awarding large dollar amounts in attorney fees for public interest litigation ($171,510, *Dowell v. Board of Education*, 71 F.R.D. 49 (W.D.Okl. 1976)), neither will it blindly leap to presumptions of reasonableness in light of the atmo-

sphere of cooperation being displayed by the State.

A further consideration at that time was the substantial legal assistance being provided throughout the litigation by the United States Department of Justice, Civil Rights Division (plaintiff-intervenor). On December 18, 1980, the court issued a minute order wherein it stated:

"It appears that counsel for plaintiff-intervenor [Department of Justice] has carried the work load on the problem of medical and mental health care and, therefore, the court finds additional representation would not be materially beneficial. All other counsel are, of course, invited to attend and participate as ACLU representatives, but *not as persons* performing professional services under Title 42 U.S.C. §§ 1983 and 1988."

### Findings of Fact

#### I. General

1. Due to the sheer bulk of the evidence and the complicated nature of this litigation during a period of almost ten years, two devices will be used to organize and present the court's findings.

First, due to the individualized nature of the award to each attorney, the findings will be detailed separately as to each applicant.

2. Second, the historical character of the case dictates that it be classified as consisting of four (4) separate and distinct phases. These phases can be identified not only by the historical landmarks which trigger a new era, but also by the nature of the legal problems encountered during each period.

Historically, Phase I ensues with the filing of the original action in August, 1972, and culminates in the issuance of the court's order of May 30, 1974. *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl.1974). Recognizing this clear historical landmark, this decision has been labeled as *Battle I* in various legal literature. *See, Battle v. Anderson*, 594 F.2d 786, 788 (10th Cir. 1979). However, Phase I is not only historically compelling of classification, but it can be characterized in legal terms as a period of pioneering constitutional issues as relating to prison conditions.

Phase II in turn, culminates with the decision known as *Battle II* rendered June 14, 1977, and affirmed by the Tenth Circuit on October 26, 1977. *Battle v. Anderson*, 447 F.Supp. 516 (E.D.Okl.1977), *affirmed* 564 F.2d 388 (10th Cir. 1977). The principal legal difficulty during this period was non-compliance and obstructionism.[4]

Phase III began with the affirmation of *Battle II* (October, 1977) by the Tenth Circuit and proceeded until March 15, 1979. During this period the court issued a detailed compliance order invoking the Federal Court's broad equitable powers in remedying past constitutional violations. *Battle v. Anderson*, 457 F.Supp. 719, 734 (E.D.Okl. 1978). This curative order was appealed by the State and it was not reversed, but remanded by the Circuit for the State to have an opportunity to present a remedial plan. This remand took place on March 15, 1979. *Battle v. Anderson*, 594 F.2d 786 (10th Cir. 1979). The legal issue during this period was substantially different than during Phase I and II. As the court stated in 1978, the issue during this period was compliance.[5] During this period the legal issues were not novel nor complex. The emphasis here was on discovery and expert opinion on compliance. There was no evidence during this period of obstructionism. The sole issue was that of standards and remedy.

However, this recognition of a new type of legal problem is not to be discounted, but noted and evaluated. As the court said on February 7, 1978:

> "There has been a tremendous amount of work and under our judicial system, the advocate system, the court can't operate except through the work of officers of the court, through the work of the lawyers.... Without the lawyers, nothing can be done. The court can't be an advocate. The court can't go out [t]here and muster the evidence and so forth, so it boils itself down to our American system of advocacy, of the lawyers picking up the problems...." (Tr. 48–49).

Phase IV began a tremendous shift of responsibility from the plaintiffs' attorneys'

---

4. As stated by the court,
   "This court has found on five separate occasions since May 30, 1974, that the Defendants were not in compliance with its order or that the Defendants were obstructing the orderly resolution of this case." 447 F.Supp. at 518.

5. "The hearing on August 14, 15, 1978 was not a trial in the normal use of the term. Rather, it was an evidentiary compliance hearing to dètermine if the defendants were in compliance with this Court's prior orders [citations omitted] ... The hearing did not focus on the existence of constitutional violations, for those had already been found in *Battle I* and *II, supra*, but rather was an audit of compliance with the prior orders, and an appraisal of the possible remedies to be required from the defendants in order to effectuate those orders." 457 F.Supp. at 734.

shoulders. On April 19, 1979, the political leaders of both the executive and legislative branches of Oklahoma's state government came voluntarily before the court and pledged themselves to remedying the constitutional problems of the Oklahoma prison system.[6] During this period the legal problem was not constitutional violation nor that of compliance. The issue was only one of formalization. The skills to be exercised during this period were those of negotiation, not hard legal skills. The task to perform was to reduce to writing jointly affirmed principles with the corresponding obligation of disentanglement. Characteristic of this period is the Stipulation of the

Parties Concerning Standards, filed January 22, 1981, and beginning with these words:

"These parties to this litigation, i.e., the plaintiffs, the plaintiff-intervenor, and the defendants, have all agreed that the lawsuit is ready to enter into a new phase, i.e., the submission of the case to a court-appointed monitor who will monitor compliance with the court's prior orders, thus obviating the need for routine compliance hearings."

3. The court determines that, at a minimum, 40 percent of the workload of the case was carried by the Civil Rights Divi-

---

6. During a hearing per direction of the Tenth Circuit Court of Appeals regarding compliance, on April 19, 20 and 23, 1979, the following testimony was offered:

### TESTIMONY OF GOVERNOR GEORGE NIGH

"A  As a candidate, I took the position that the courts were the supreme law and that I, although I was regretful that it seemed that, a lot of times, that the State's actions were brought about by court order or federal requirements and so forth, that if I were Governor I certainly would respond as Governor who would take the oath of office to uphold the law, and the Supreme Court decisions being a part of it, court decisions being a part of the law of the land.

When I made my budget process making then, I talked to Dr. Benton and others of his staff, who obviously had been involved in the court proceeding, and asked him in his opinion to advise me as the expert what I should recommend in a balanced budget to the Oklahoma Legislature.

And I will say quite frankly, that of all the budget recommendations that I made, there were very few where I was able to say I wanted to recommend what was the estimated maximum amount that that expert thought was needed. In many other agencies of state government I was not able to make that.

In talking to Dr. Benton and the others, we agreed upon 'I am going to take a look at $40 million, et cetera.' What ever that amount was it was that—that was what I was told as the Governor-Elect, that was needed to comply with the court order." (Tr. 64)

### TESTIMONY OF GENE HOWARD PRESIDENT PRO TEMPORE, STATE SENATE

"Q  [By John Fischer, Assistant Attorney General]  In your position as State Senator and President Pro Tempore of the Senate, are you committed to the funding of this plan and to its implementation?

A  I have agreed to support it and use all I can legitimately to attempt to get it enacted through the Oklahoma Senate.

Q  Would you explain to the Court what your commitment entails in the programs that you foresee?

A  Conferring with the members of the Senate, with the conferees which I appoint to the Joint Conference Committee that will be considering the bill, and asking their support, and exercising the influence that I can in my position and with my fellow members, to attempt to get their support for it.

I might say this, I have discussed with a number of the members of the Senate the plan, the general outline, and their attitude for making that commitment, and I have found overwhelming support for it." (Tr. 37)

### TESTIMONY OF DAN DRAPER SPEAKER OF THE HOUSE OF REPRESENTATIVES

"Q  [By Janet Cox, Assistant Attorney General]  Speaker Draper, are you familiar with the defendants' proposed plan which has been submitted as Exhibit 1 in this case?

A  Yes, I am.  I have spent quite some time going over it verbally with members of the House and Senate, and also examining the written document itself.

Q  Is it your position after reviewing that document that you are committed to the funding and implementation of that plan?

A  Yes, I—I have spent a considerable amount of time during the current session visiting a number of the correctional institutions in Oklahoma, and I think that the plan as outlined to the Court is a reasonable plan which would comply with the constitutional standards prohibiting cruel and unusual punishment of inmates, and I am committed to doing everything that I can to see that it is properly funded during the current session of the Legislature." (Tr. 318–319)

sion of the Department of Justice, acting as the plaintiff-intervenor, United States of America.

Adding to this figure the participation and support services rendered by the ACLU, state officers and the National Prison Project of the ACLU, the burden of the workload carried jointly by the plaintiffs' counsel was never in excess of 50 percent.

4. The court finds that the Attorney General of Oklahoma is currently compensated at the rate of $35,000 per year or at approximately $17.50 per hour *pure compensation*. The court also finds that this figure does not include the normal overhead and risk factors built into private attorney compensation schedules.

■ 5. The court takes judicial notice that it has ordered its Fact Finder, John Henry Albach, Esq., a recognized expert on prison affairs and prison law, to be compensated for his services in this case at a rate of $75 per hour.

Mr. Albach's academic credentials are excellent. He graduated Magna Cum Laude from Tufts University, Medford, Massachusetts, with a Bachelor of Arts in political science and English. He received his law degree from The University of Texas. But more importantly, his qualifications as a prison expert are exceptional. He has been the Executive Director of the Texas Council on Crime and Delinquency, Staff Director of the Joint Committee on Prison Reform of the Texas legislature, and a staff researcher of the Harvard Law School Center for the Advancement of Criminal Justice.

## II. Mary E. Bane, Esq.

6. The applicant, Mary E. Bane, graduated from The University of Oklahoma School of Law in 1972 and was admitted to the practice of law in August of that year. However, the court finds that the experience level of Ms. Bane exceeded that of most initiate lawyers. Ms. Bane took an interest in inmate rights questions during law school, and in fact, caused to be offered and took a course on inmate rights at The University of Oklahoma School of Law.

Therefore, the court finds that when Ms. Bane began her law practice, she was schooled in legal rights of inmates.

7. Mary E. Bane initially worked on this case when as a law school graduate she amended and briefed the *pro se* complaints of the plaintiffs. She was appointed in March, 1973, to represent the entire plaintiff class. This representation was during the critical first phase of this action. During this time period a disastrous riot occurred at the Oklahoma State Penitentiary, McAlester, Oklahoma, beginning July 27, 1973. This riot, which resulted in the tragic loss of lives and the destruction of $20 million in state property, necessitated extraordinary legal abilities on the part of Ms. Bane and the attorneys from the Civil Rights Division of the U. S. Department of Justice.

Ms. Bane was serving as lead counsel for the inmates when the court rendered the order of May 30, 1974. This order determined that the operation of the Oklahoma prison system was in violation of the United States Constitution in the following respects:

A. Racial discrimination and segregation

B. Procedural due process

C. Cruel and unusual punishment

D. Medical care

E. Correspondence rights

F. Right to receive publications

G. Access to courts

H. Religious freedom

However, it is noted that during the presentation of this initial action, although Ms. Bane was lead counsel for plaintiffs, the assistance of the Civil Rights Division of the Department of Justice was substantial. In fact, the court finds that the plaintiff-intervenor provided the bulk of the persuasive evidence during the trial and the legal briefing.

8. The court finds that subsequent to October, 1975, Ms. Bane's involvement with the case has been minimal.

9. Ms. Bane expended a minimum of 994 hours during the period at issue. During this period the rate actually billed for her services ranged from a pure compensation rate of $15 to billing rates of $50 per hour.

The then prevailing rate of Oklahoma lawyers, irrespective of the difficulty of the case, ranged from $35 to $60 per hour.

10. All expert witnesses who testified regarding attorney fees, both those provided by the plaintiffs and defendants, concurred that a reasonable fee for the services claimed by Ms. Bane would be no less than $50 per hour.

11. The court finds that actual loss of reputation and severe mental anguish were visited upon Ms. Bane during the period encompassed by the First Phase of this litigation.

### III. Louis W. Bullock, Esq.

12. The applicant Louis W. Bullock graduated from The University of Oklahoma Law School in 1975 and was admitted to the practice of law later that year.

The time period encompassed in this application reflects initial involvement of an attorney of only two years' experience. However, due to his personal involvement in the early stages of this action as a law clerk and his clear interest in prison law as reflected by his participation in the McAlester Prison Project as a law student, the court finds his experience level to be beyond that of an average lawyer of just over two years' experience.

13. In October, 1975, Mr. Bullock assumed the responsibility of lead counsel for the plaintiffs, a position he has maintained unto the present. This time period would encompass Phases II, III and IV.

14. The court finds that the hours expended by Mr. Bullock during Phase II of the case have already been compensated. Further, it will take judicial notice of the fact that the award for that period was for $60 an hour and consisted of 493 hours.

15. During the service of Mr. Bullock in the time periods encompassed by Phases III and IV, the plaintiffs and plaintiff-intervenor Civil Rights Division, U. S. Department of Justice obtained orders requiring

A. The closing of cell houses at McAlester and Granite

B. Reduction of prison populations

C. Improved levels of health and sanitation

D. A fully staffed and equipped medical delivery system

E. The establishment of law libraries and access to courts

F. The implementation of stricter guidelines on use of force

G. The protection of the religious rights of Native American Indians

H. A mental health delivery system.

It is also noted that the plaintiff-intervenor provided the expert witnesses and most legal briefing during this period.

16. The court finds that Mr. Bullock spent 671.5 hours during the time period encompassed by Phase III and 1,061 hours during Phase IV.

During the periods thus claimed, the applicant actually received compensation ranging from approximately $56 to $100 per hour from his other clients.

The then prevailing rate of Oklahoma lawyers, with principal responsibility for a case and corresponding expertise, was $60 to $100 per hour during the applicable period.

### IV. Carl G. Stevens, Esq.

17. The applicant, Carl G. Stevens, graduated from The University of Oklahoma School of Law in 1975 and was admitted to practice later that year.

The time period reflected in this application would indicate that Mr. Stevens had only two years' experience in the practice of law when he began his involvement in late 1977. However, Mr. Stevens' educational experiences point toward a keen interest in prison litigation (although to a lesser extent than his co-counsel). During his legal education he studied prisoner rights issues and was actively engaged in the El Reno Prison Project. Therefore, the facts indicate that

upon joining the *Battle* action, Mr. Stevens' legal expertise and value exceeded that of the average lawyer with a similar graduation date.

18. Immediately after the court decision of *Battle II*, Mr. Stevens joined the case. Thus he was involved only during the compliance phases of *Battle*, Phases III and IV.

His first duty was to serve as counsel on the initial fee application which was heard February 6 and 7, 1978. After this initial attorney fee hearing, Mr. Stevens continued to assist on the case, serving as co-counsel for the plaintiff class.

His work then was centered on the preparation of a compliance report. This report reviewed the state of compliance with the court's prior orders, and covered a wide range of issues. This report was the basis for the court's opinion of September, 1978.

19. The court finds that Mr. Stevens devoted 287.8 hours to prosecution of this action during Phase III of this case and 587.15 hours during Phase IV.

The court further finds that the record does not indicate the actual average hourly rate charged to other clients of Mr. Stevens. However, the record is clear that the prevailing rate charged in Oklahoma for a young assistant counsel ranged from $45 to $65 per hour during the application period.

20. The court finds no evidence of stigma or enmity resulting from this case as affecting Mr. Stevens.

### V. Expenses and Costs

21. The court finds that expenses were advanced by the ACLU in furtherance of the litigation in the sum of $1,167.90.

The out-of-pocket expenses of the ACLU National Prison Project were proven to be $517.74 and appear reasonable and necessary.

22. The court notes that the 16 hours claimed by Mr. Bullock on behalf of attorney Gary Neal were only slightly addressed. The evidence indicates that these hours were spent only in legal assistance tasks. The evidence was also uncontroverted that the standard billing practice in Oklahoma for legal assistant work was ⅓ to ½ of the sponsoring attorney's rate where billed separately.

The court takes judicial notice of the fact that Mr. Neal was an attorney of record at the District Court level of the order of June 14, 1977, commonly referred to as *Battle II.*

23. The determination of $14,779.69 of out-of-pocket expenses expended toward the advancement of this action from December, 1977, through March 4, 1982, by all plaintiff counsel is not disputed and appears reasonable and necessary.

### Conclusions of Law

#### I. Prevailing Party

1. The authority for the awarding of attorney fees in this action arises from 42 U.S.C. § 1988. This statute provides in pertinent part for the awarding of "a reasonable attorney's fee as part of the cost[s]" in a civil rights action.[7]

2. The court is directed by this statute to award fees only to the "prevailing party." This term was disputed as to its effect upon the present actions. As in all cases, no party succeeded on every argument tendered. Due to this fact, the defendants contend that each unsuccessful argument was a substantially separate issue which the plaintiffs raised but on which they did not prevail.

■ It is well settled that no fees are awardable for pursuit of frivolous issues or issues asserted in bad faith. *Littlefield v. Deland,* 641 F.2d 729, 732 (10th Cir. 1981); *Gurule v. Wilson,* 635 F.2d 782, 794 (10th

---

7. § 1988. Proceedings in vindication of civil rights

"... In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Cir. 1980). However, there are no facts in this case to bring this principle to bear.

The contention of the defendants is based upon a confusing historical trilogy of opinions relating to attorneys' fees within the Tenth Circuit. The first of these three cases was *Battle v. Anderson,* 614 F.2d 251 (10th Cir. 1980). Interestingly, "prevailing party" was an issue litigated in the first *Battle* attorney fees award. In that initial fees action, the court found the fee was awardable on virtually all issues as long as the litigant succeeded "on any significant issue in litigation which *achieve[d] some* of the benefits sought in bringing suit." 614 F.2d at 256 (emphasis added).

The second opinion followed hard on the heels of *Battle* and seemed to apply an even broader test. In *Gurule v. Wilson,* 635 F.2d 782 (10th Cir. 1980), the court made it clear that the plaintiff did not have to win every motion. The attorney would be paid for all work performed in the course of the lawsuit, as long as the legal work was " *'reasonably calculated'* to promote the client's interest even if unsuccessful." 635 F.2d at 793 (emphasis added).

However, the third opinion of the trilogy appeared to retreat from this broad standard. In its opinion on rehearing filed some six weeks afterward, the *Gurule* court cautioned:

> "We stated that in awarding attorneys' fees to the prevailing party under 42 U.S.C. § 1988, it is inappropriate to proportionately reduce the fee for every motion where the party prevails overall on the main issue in the case. It was not our intention to suggest that a court may never proportionately reduce a requested attorney's fee for time spent on *substantial separate* issues which a plaintiff raises but on which he does not prevail. . . ."

*Gurule v. Wilson,* 649 F.2d 754 (10th Cir. 1981).

Analysis of this trilogy of opinions yields the following tests to be applied to determine the prevailing party. First, a determination of the "main issue" in litigation must be made. The test applied to this main issue is whether the legal work was "reasonably calculated to promote the client's interest even if unsuccessful." *Gurule v. Wilson,* 635 F.2d 782 (1980), *modified,* 649 F.2d 754 (1981). Second, any other issue not directly relating to the "main issue" should be designated as a substantially separate issue. The test to be applied to this substantially separate (significant) issue is whether it *"achieves some* of the benefits sought in bringing suit." *Battle v. Anderson,* 614 F.2d 251 (10th Cir. 1980).

The court therefore concludes that the "main issue" of this lawsuit is the determination and subsequent enforcement of the minimum constitutional requirements of penal confinement in Oklahoma. All of the issues identified as substantially separate by the defendants have been *directly* related to that identified "main issue."

Applying then the test of "reasonably calculated to promote the clients' interests," the court determines that the plaintiff class has been the "prevailing party" on all challenged issues.[8]

## II. Calculation of Reasonable Attorney Fees

3. The calculation of reasonable attorneys' fees must grow out of the policies behind the authorizing statute, 42 U.S.C. § 1988. The policy, as expressed by the Congressional history of the statute, is to privately enforce civil rights. The free assertion of civil rights by private citizens must be encouraged.[9] Incident to this free

---

8. The unity of the issues is clearly evidenced by the inability of the applicants to itemize, by separate issue, the expenses and hours expended in the prosecution of this case. This inability continued in the face of a direct order from the court to do so with its attendant possibility of judicial sanction.

9. "If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court." S.Rep.No. 94–1011, 94th Cong., 2d Sess. 2, reprinted in [1976] U.S.Code Cong. & Ad.News 5908, 5910.

exercise of civil rights by a private citizen is the selection of a method to prevent abridgement of those rights absent the entanglement of governmental bureaucracy. The method envisioned by Congress is that of a "private attorney general."[10] The idea here is that a private attorney would be employed to enable a private citizen to quickly vindicate an abridgement of their civil rights.

With the clear public policy of free exercise of civil rights and its chosen method of enforcement, Congress also expressed its views on the compensation of the "private attorneys general." Discussing the case history in other public interest litigation, the Congress looked favorably upon a compensation schedule based upon normal fee-paying client relationships. It was stated that this would not result in a "windfall to attorneys" and anything less would result in "no private enforcement."[11]

■ 4. In keeping with the policy announced by Congress, the Tenth Circuit has generally adopted the multi-factor test used in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).[12] *See, Francia v. White*, 594 F.2d 778 (10th Cir. 1979). While the court should consider all the relevant factors, it need not wave each as a talisman before reaching a decision. *Littlefield v. Deland*, 641 F.2d 729, 732 (10th Cir. 1981). Neither should the court neglect a relevant factor not listed in *Johnson, supra.*

*See, Colyar v. Third Judicial District Court*, No. 80–1809 (10th Cir. June 22, 1981) (not for routine publication); *Love v. Mayor of Cheyenne, Wyoming*, 620 F.2d 235 (10th Cir. 1980).

■ It has been argued that the participation of the Civil Rights Division of the United States Department of Justice should be applied as an additional factor to reduce the amount of the reasonable fee, due to its substantial involvement. However, a separate consideration of this factor would result in an artificial depression on the reasonable rate. The participation of the Department of Justice will affect the first *Johnson* factor of "time and labor" and the second factor of "difficulty of the questions." Obviously, the plaintiffs' counsel had an easier "row to hoe" with outside assistance accounting for one half of the burden. But, to use that participation to uniformly reduce the amount awarded would result in a penalty for cooperative effort.

## III. Reasonable Fee for Mary E. Bane

■ 5. Although all expert testimony agreed that $50 would be a reasonable fee per hour for Ms. Bane, no single factor or arbitrary determination of a fee is proper. The court must evaluate all relevant factors in arriving at a reasonable fee award. *Gurule v. Wilson*, 635 F.2d 782, 793 (10th Cir. 1980); *Campbell v. U. S. Civil Ser. Comm.*, 539 F.2d 58, 62 (10th Cir. 1976).

**10.** "The idea of the 'private attorney general' is not a new one, nor are attorneys' fees a new remedy. Congress has commonly authorized attorneys' fees in laws under which 'private attorneys general' play a significant role in enforcing our policies." *Id.* at 3.

**11.** "These cases [public interest litigation] have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys. In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client. . . . If the cost of private enforcement actions becomes too great, there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases." *Id.* at 6.

**12.** (1) The time and labor required.
(2) The novelty and difficulty of the questions.
(3) The skill requisite to perform the legal service properly.
(4) The preclusion of other employment by the attorney due to acceptance of the case.
(5) The customary fee.
(6) Whether the fee is fixed or contingent.
(7) Time limitations imposed by the client or the circumstances.
(8) The amount involved and the results obtained.
(9) The experience, reputation, and ability of the attorneys.
(10) The "undesirability" of the case.
(11) The nature and length of the professional relationship with the client.
(12) Awards in similar cases.

6. The court makes the following conclusions on the twelve factors of *Johnson v. Georgia Highway Express, supra.*

### A. *The Time and Labor Required*

Ms. Bane labored in this case principally during the time period encompassed by Phase I. Although she was not untrained as to prisoner litigation, the area was only slightly explored and extraordinary effort was expended by Ms. Bane in marshalling the evidence needed for constitutional examination.

### B. *The Novelty and Difficulty of the Questions*

The issues in this case can be said to be novel only during the period prior to the 1974 order known as *Battle I.* This was the period during which Ms. Bane served. The task would have been Herculean if not for the participation of the Civil Rights Division of the United States Department of Justice. However, due to this outside participation, the case cannot be classified as extraordinarily difficult for Ms. Bane. While it is true that substantial amounts of time were involved (as stated above), the division of legal issues rendered each manageable.

### C. *The Skill Requisite to Perform the Legal Service Properly*

The plaintiffs' expert, Mr. Al Bronstein, testified that at the time of the 1974 order, conditions were in such obvious need of correction at the Oklahoma State Penitentiary that a "high school student could have won the case." The court does not agree. This suit is a class action with multiple issues and complex legal argument required. The skill required in this case is beyond that of a normal civil action.

### D. *The Preclusion of Other Employment by the Attorney Due to the Acceptance of the Case*

While at various times during trial great amounts of effort were required, this case (like most civil cases) was sporadic. Deference was normally given to conflicts and schedule considerations. Therefore, the court concludes that preclusion of other employment was minimal and consisted of no more interference than normal civil actions.

### E. *The Customary Fee*

The court found the range of Oklahoma attorney fees to be from $35 to $60 per hour.

### F. *Whether the Fee is Fixed or Contingent*

The Attorney General stated in response to this application that the "defendants would concede that the fee in this case is 'necessarily contingent.'" But, it is contingent only in the respect of a need to "prevail." Upon the rendering of *Battle I,* the only contingency remaining was the amount. The amount of fees in all public interest litigation is speculative but generally found to be substantially the equivalent of fee-paying clients. The fee then at any subsequent point of the action was as "secure as any ongoing hourly fee arrangement in the private sector. Considering this fact, the only period that the contingency of the fee is a factor is during Phase I of this case. This factor, therefore, is relevant only to Ms. Bane's application.

### G. *Time Limitations Imposed by the Client or the Circumstances*

The very nature of this case requires time. Normally, a finding of a constitutional violation of the plaintiffs' rights resulted in a significant time delay to allow Legislative action. Due to this circumstance, the pressure of the case was rarely oppressive. This fact is reflected in the high quality of the legal work performed during the progress of the case. Therefore, this factor is of little importance in determining the reasonable fee.

### H. *The Amount Involved and the Results Obtained*

As a result of the services rendered by counsel in these proceedings, the prison system in the State of Oklahoma has moved

forward from the 19th or possibly the 18th century, and into the 20th century. The conditions determined to have existed prior to May, 1974, have improved to the point where Oklahoma has been referred to in testimony as a model system.

As a direct result of the activities of plaintiffs' counsel, the State of Oklahoma has expended in excess of $153 million in improving its facilities and staff.

Ultimately though, the contribution of this action is in terms of human rights. This case has resulted in individuals being treated with decency instead of contempt. No price-tag can be placed upon that result.

### I. The Experience, Reputation and Ability of the Attorney

The ability of Ms. Bane exceeded that of her contemporaries due to her specialized training. However, she undertook this case with no actual legal experience or reputation.

### J. The "Undesirability" of the Case

In the early phases of the case, the "undesirability" of this action was immense. The court itself suffered sleepless nights, ridicule and harassment. Ms. Bane shared in this suffering.

Reflecting the undesirability of such cases is the experience of the ACLU in obtaining attorneys to serve in similar capacities. The ACLU State Director testified that she had not been able to recruit attorneys to take a number of local government jail cases in Oklahoma which the organization deemed meritorious.

The court, therefore, concludes that the initial phases of the action were undesirable. The court further concludes that this undesirability directly affected the applicant Mary Bane.

### K. The Nature and Length of the Professional Relationship With the Client

This factor is not deemed to be of significance in setting the fee in this matter since it primarily relates to those types of clients who might provide repeat business.

### L. Awards in Similar Cases

Plaintiffs have introduced evidence of numerous awards in prison cases throughout the nation. The amounts involved range from a total of $160,000 to $709,933.50. The large totals, however, are of little probative value. The fee schedules of different areas of the country are widely variable. The issues involved in each jurisdiction are unique. Perhaps the factors of greatest importance are the variation of experience of each attorney and the help he received from outside sources.

The court concludes that only the case of *Ramos v. Lamm*, 539 F.Supp. 730 (D.Colo. 1982), is particularly helpful. Although the *Ramos* case involves experienced attorneys with no outside help from the Civil Rights Division of the U. S. Department of Justice, it contains a detailed analysis of the basis for its award. The factors of *Ramos* helpful to this case are its close proximity, identical circuit court of appeals legal precedent, and substantially similar constitutional questions. The average reasonable attorneys' fee awarded in *Ramos* was approximately $80 an hour.

■ Considering the factors of the experience of the applicant attorneys and the significant outside assistance available to them in the preparation of the case, the court concludes that an average attorney's fee rate for the incident case would be less than $80 an hour.[13]

---

**13.** The hourly rates awarded by the *Ramos* court are detailed in a chart on page 751, 1982. The high award of $125 given to an attorney described as "an internationally recognized expert in the field and contributo[r] to the success of this case in much the same manner of the senior partner of any large firm." At 749. The lowest fee awarded was that of $60 per hour.

However, this figure was an adjustment upwards due to the delay in payment of the fee. In the incident case the delay was due principally to personal preference rather than termination of a particular part of the proceedings. It would be improper in this case to adjust upwards a reasonable rate of compensation, when the attorneys chose to delay their appli-

7. Therefore, in consideration of the stated twelve factors of *Johnson v. Georgia Highway Express, supra*, the factors of experience and difficulty of the questions would dictate less than the maximum fee normally charged in the Oklahoma legal community. The court concludes that due to the abundance of factors tending to enhance the fee charged, that it will award the billing rate of $50 per hour. This would correlate to the highest fees charged by Ms. Bane during the period of the application.

8. Application of this appropriate hourly rate of $50 per hour to the court's finding of 994 hours of services rendered by Ms. Bane results in a total award of $49,700.

## IV. *Reasonable Fee for Louis W. Bullock*

9. The court makes the following determinations regarding the twelve factors enumerated in *Johnson v. Georgia Highway Express, supra*, as they relate to Mr. Bullock.

Initially, the court judges that Conclusions of Law numbered 6(D), 6(F), 6(G), 6(H), 6(K) and 6(L) are also relevant to the determination of the reasonable rate of compensation for Mr. Bullock. Therefore, the stated provisions are herein incorporated by reference.

### A. *The Time and Labor Required*

Mr. Bullock labored 671.5 hours during Phase III of this case. This particular phase did not involve a significant amount of labor on the part of Mr. Bullock. The principal task during this period was to prepare a report on the compliance of the State of Oklahoma with the *Battle I* and *II* orders.

During Phase IV of this action, Mr. Bullock expended 1,061 hours in service of his clients. Once again, the labor involved was minimal. Very little "hard law" was practiced during this period. The principal task during this period was the preparation of a set of stipulated standards that could be used to ensure the constitutional rights of prisoners were protected.

cations for almost six years after the bulk of

### B. *The Novelty and Difficulty of the Questions*

There were no novel questions of law to be resolved during Phase III and IV of *Battle.*

However, the difficulty of the questions that were presented during the third period of this litigation were often significant. During Phase III the *Battle* case became a political issue and a favorite campaign trail topic. This attitude of the State's political leaders clouded the issues. Often what was a simple issue became a major battleground due to this complication.

Phase IV had few difficulties due to the spirit of cooperation expressed throughout by the leaders of the State of Oklahoma.

### C. *The Skill Requisite to Perform the Legal Service Properly*

This factor was discussed by the defendants in their response to the attorney fees applications. They stated:

"The Defendants would, in any event, concede that Mr. Bullock has been called upon to utilize every skill which is needed of an attorney. . . ."

The court concurs. The court would also note that the extraordinary skills of negotiation were required during this period. During the period of cooperation, Mr. Bullock had to actively pursue the desires of his clients and concurrently acquiesce in the stipulations regarding minimum constitutional standards. It is also noted that Mr. Bullock always zealously represented the best interests of his clients.

### D. *The Customary Fee*

The court found the range of Oklahoma attorney fees as applied to Mr. Bullock's situation to be from $60 to $100 per hour.

### E. *The Experience, Reputation, and Ability of the Attorney*

The ability of Mr. Bullock exceeded that of his contemporaries. In fact, Mr. Lawrence, Deputy Chief of Special Litigation

their service was rendered.

for the Civil Rights Division of the U. S. Department of Justice, testified that he would rank the performance of Mr. Bullock in the top five percent of those he has supervised. Mr. Lawrence currently supervises almost 30 attorneys in the Justice Department.

The court, while concluding that the ability of Mr. Bullock exceeds that of his contemporaries, takes note of the fact that Mr. Bullock completed his formal legal education in 1975.

### F. The "Undesirability" of the Case

Unlike Ms. Bane, Mr. Bullock took this case with the full knowledge of public reaction. Also, unlike Ms. Bane, Mr. Bullock has gained a tremendous reputation throughout the State.

The court notes the adverse reaction of the "fringe element" surrounding any widely publicized case; however, the overall impact of this case on Mr. Bullock, especially during the last two phases, has been beneficial. For example, Mr. Al Bronstein, the Director of the National Prison Project of the ACLU and recognized by many as the most knowledgeable person in prison litigation in the nation, testified that his office has called Mr. Bullock for opinions and advice.

10. Therefore, considering the above enumerated *Johnson* factors and those incorporated by reference, the court concludes that the reasonable rate of compensation should be delineated as to the phase in which services were rendered.

Phase III of this action has only one significant factor that would provide a basis for the enhancement of the fee of $60 per hour found reasonable during Phase II. During the application period the prevailing rate of Oklahoma lawyers, with principal responsibility for a case and corresponding expertise, was $60 to $100 per hour. The factor of the "difficulty of the questions," as dictated by the political climate, would tend to enhance the fee. Thus, to award the minimum prevailing rate for services rendered during Phase III would be improper. Likewise, due to the nature of the

litigation involved during this period and the substantial assistance provided by outside sources, the upper range of prevailing fees would be unjustifiable.

■ The court, therefore, concludes that a reasonable rate of compensation for the 671.5 hours of service rendered during Phase III of this action would be $70. This results in an award to Mr. Bullock for the period encompassed by Phase III of $47,005.

11. The factor of "the skill requisite to perform the legal service properly" will affect the determination of a reasonable fee for Phase IV of this civil action. The additional skills displayed by Mr. Bullock in working in cooperation with the State directly benefits his clients as well as the welfare of the entire State of Oklahoma. Additionally, common sense would dictate that the hourly fees charged a client in 1980 would exceed those in 1978. The court concludes these factors would render an award of $70 per hour (as applicable for Phase III) unreasonable for the period embraced by Phase IV.

In consideration of the factors articulated above and those earlier discussed in the opinion, the court concludes that $80 per hour is a reasonable fee for the 1,061 hours of service to the plaintiff class. Application of this appropriate hourly rate results in an award of $84,880 to Mr. Bullock for the services he performed in Phase IV of this litigation.

12. The total award of attorney fees for the application period for Mr. Bullock's services is therefore $131,885.

### V. Reasonable Fees for Carl G. Stevens

13. The court makes the following determinations regarding the twelve factors enumerated in *Johnson v. Georgia Highway Express, supra.*

The court incorporates Conclusions of Law numbered 6(D), 6(F), 6(G), 6(H), 6(K), 6(L) and 9(B) by reference. Each of these incorporated sections are relevant to the determination of Mr. Stevens' fee.

## A. *The Time and Labor Required*

Mr. Stevens' role is that of assistant counsel in this action. The first determination to make is whether there was a need for additional time and labor. Was there any duplication of effort? The court concludes there was not. Mr. Stevens came into the case during the compliance period herein designated Phase III. During this phase extensive evidence was required by the court to evaluate the extent of compliance with its prior orders. Evidence of the need for additional plaintiffs' counsel was the fact that throughout the proceedings the defendants maintained multiple counsel.

Therefore, the court concludes that the 287.8 hours devoted to the case during Phase III and 587.15 hours during Phase IV were properly spent.

## B. *The Skill Requisite to Perform the Legal Service Properly*

Serving as the assistant in this action, Mr. Stevens was called upon to exercise minimal "hard legal" skills. However, the court notes that considerable organizational and analytical skill is required to assemble the reports and evidence required of counsel throughout this application period. These services could not be accomplished by paralegals and were reasonably delegated to an attorney.

## C. *The Customary Fee*

The customary fee for assistant counsel of similar qualifications to Mr. Stevens was found to be $45 to $65 per hour during the application period. Although plaintiffs cite an example of an award to Mr. Stevens of $80 per hour as lead counsel for a civil rights case in 1979, *Rex v. Owens*, Civ. 79–683–E (W.D.Okl.1979) (unpublished opinion) the court finds this evidence unpersuasive. The role of lead or assistant counsel is significantly different.

## D. *The "Undesirability of the Case*

The court heard no evidence that persuaded it that this was a factor as applied to Mr. Stevens.

14. Applying the factors as indicated above, the court concludes that the assistance of Mr. Stevens was of the highest quality during the application period. The court, therefore, determines that for the period of Phase III a reasonable attorney fee of $60 per hour would compensate Mr. Stevens for his services rendered on behalf of the plaintiff class. Application of this rate results in an award to Mr. Stevens of $17,268 for the 287.8 hours found to be appropriate to Phase III.

Noting the passage of time as it applies to attorneys' fees, the court further concludes that a rate of $65 per hour would be proper for the period denoted as Phase IV. Application of this rate results in an award to Mr. Stevens of $38,164.75 devoted to the prosecution of this action during Phase IV.

15. The total award of attorney fees for the application period for Mr. Stevens is, therefore, $55,432.75.

## VI. *Expenses*

16. The court concludes that due to the findings regarding Mr. Gary Neal that the claimed 16 hours should be taxed at ½ of the rate awarded to Mr. Bullock for his participation during Phase III of this case. Therefore, applying this rate of $35 the court awards a total of $560 for services rendered during the application period. It is noted that this is the minimum range of attorney rates during the period of Mr. Neal's apparent participation.

### *Conclusion*

The very nature of this suit is an unfortunate occurrence. The concept that private citizens must be authorized to select "private attorneys general" to enforce their civil rights results in a waste of valuable state resources. Congress recognized that it is the duty of each state's legal officers to insure the protection of civil rights insofar as possible, but realized that private enforcement was a necessary alternative.[14]

---

**14.** "All of these civil rights cases depend heavily [not exclusively] upon private en-

forcement, and fee awards have proved an

Nevertheless, it is the duty of each state to take aggressive action to assure their citizens that all state operated facilities are in compliance with the minimum constitutional rights guaranteed each American. The court therefore welcomes the attitude exhibited by the political leaders in April, 1979, and the recent reaffirmance by the Oklahoma Attorney General as these officers undertake to eliminate the need for further "private" intervention.

Therefore, the court will award fees and costs on separate and individual orders in conformance with the findings of fact and conclusions of law stated above. Three separate appropriate judgments will accordingly be entered herein.

Robert A. Swift, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for plaintiff.

Robert S. Forster, Jr., Krusen, Evans & Byrne, Philadelphia, Pa., for defendant.

---

essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S.Rep. No. 94–1011, 94th Cong., 2d Sess. 2, reprinted in [1976] U.S.Code Cong. & Ad.News 5908, 5910.